# ELSIE MARY SCHILLING v. ROUX DISTRIBUTING COMPANY, INC., AND OTHERS.[1]

July 24, 1953.

No. 36,018.

[1]Reported in 59 N. W. (2d) 907.

*Linus J. Hammond, Cummins, Cummins, Hammond & Ames,* and *William J. Hayes,* for appellant.

*Loftsgaarden & Loftsgaarden,* for respondent.

KNUTSON, JUSTICE.

Appeal from an order of the district court denying defendant's motion to dismiss the action for lack of jurisdiction and denying defendant's alternative motion for judgment notwithstanding the verdict or for a new trial after a verdict by the jury in favor of plaintiff.

The action originally was commenced against Roux Distributing Co., Inc., Stuart's Beauty Supplies, and Walgreen Company, a corporation. Prior to the submission of the case to the jury it was dismissed as to Stuart's Beauty Supplies and Walgreen Company, so that when we refer to defendant herein we have reference to Roux Distributing Co., Inc., only.

Prior to answering, defendant appeared specially and moved the court to set aside the service upon it on the ground that the court did not thereby acquire jurisdiction. The motion was supported by affidavits and oral testimony was received on the return date. The motion was thereafter denied, and the answer was thereupon interposed. The jurisdictional question was preserved at the open-

ing of the trial by the answer and at the close thereof by motions to dismiss.

In view of the jurisdictional question raised by this appeal, a detailed statement of defendant's activities in this state is necessary to a proper determination of the question.

Roux Distributing Co., Inc., is a New York corporation, having its office in the city of New York, and is engaged in the business of distributing and selling some 23 cosmetic products, including Roux hair dye. It is represented in Minnesota by Joseph B. Schusser, who lives in Minneapolis and who is employed under the terms of a written contract in which he is designated as district manager over a territory comprising eight states, including Minnesota, Wisconsin, upper Michigan, North and South Dakota, Nebraska, part of Iowa, and part of Illinois. Under his supervision he has from seven to ten other employees, one of which is designated as a supervisor and one as a consultant. Schusser is paid a salary, plus a bonus and expenses while away from Minneapolis. His salary at the time of the trial was $400 per month. He was allowed nine dollars per night while away from Minneapolis and his railroad fare in traveling. He was assigned a "quota" and was paid a bonus of one percent on the quota assigned and five percent on all net sales above the quota. His quota for 1951 for his territory was $150,000. Net sales for the same year amounted to approximately $203,000. Of this amount, about $85,000 to $90,000, or a little less than 45 percent of the total sales, represented sales in Minnesota.

The duties of Mr. Schusser, as prescribed by the contract, are as follows:

"* * * The District Manager shall interview prospective employees and then submit reports, with frank recommendations and the applications, to Employer. The District Manager shall obtain all necessary receipts from employees for sample cases, records and other property of the Employer. The decision of Employer in all matters relating to employees shall be controlling.

"16.  District Manager shall call upon 'retailers' and 'wholesalers' in Employer's products, cooperate with them in sales of merchandise, render service to them, assist in keeping their stock in order, aid Employer in collecting accounts and originate sales by 'wholesalers' to 'retailers'.

"17.  District Manager shall cooperate conscientiously with Employer, devote the entire time and attention during the usual business hours of the day, diligently perform assigned duties, promote good-will of 'retailers', 'wholesalers' and all handlers of Employer's products and encourage and promote display of Employer's products and encourage the increase of sales by 'wholesalers', so as to result in increased purchases by said 'wholesalers' from the Employer and to do nothing to damage the good-will and standing of Employer as to the said products in the said territory or anywhere."

Defendant sells its products to wholesalers and jobbers, who in turn supply the retail outlets.  Goods are ordered by the wholesalers and jobbers directly from the New York office on order blanks furnished by defendant.  They are shipped f. o. b. New York directly to the dealers.

Schusser and his staff call on retail dealers and wholesalers or jobbers to encourage the use of defendant's products.  They occasionally take orders.  When orders are taken from a retail dealer they are turned over to the wholesaler or jobber, who fills the order from stock on hand.  When orders are taken from a wholesaler or jobber they are sent to the New York office and filled by sending the product directly to the dealer.  All financial transactions are handled by the New York office.  Schusser calls on slow accounts and tries to encourage them to make payment but does no collecting himself.  When there are complaints, he gathers the facts and sends them to New York.  He does not adjust such complaints but receives reports from the home office as to the disposition made of them.

The district manager and other employees attend conventions and clinics conducted by the trade.  At conventions, defendant maintains a booth displaying its products, and its representatives put on

demonstrations showing the proper use of its products. The purpose of such activities is to increase the sale of its products. Schusser and the crew under him arrange displays in drugstore windows advertising defendant's products, and other advertising is also taken care of by them. In Schusser's contract of employment we find the following with respect to advertising:

"13. Employer may approve advertising to be run by certain retail advertising accounts within said territory, with the payment of said advertising to be made by Employer in cash or in merchandise shipped to such advertising accounts, but no bonus will be allowed or paid to District Manager under any circumstances on such shipments. It is mutually understood that such transactions constitute *general business expenses of Employer,* made for the purpose of increasing the sale, use and popularity of Employer's products within said territory." (Italics supplied.)

Prior to his employment by defendant Schusser received training by defendant in New York. He moved to Minneapolis and established his home here when he became district manager for defendant. As part of his contract of employment Schusser entered into the following agreement:

"25. The District Manager agrees that at no time after ceasing to be in the employ of the Employer herein, shall the District Manager represent or advertise himself or herself, as the case may be, *in business* as formerly with Roux Distributing Co., Inc. or in any similar manner." (Italics supplied.)

The contract also provides that in case the district manager discontinues his employment for any reason whatsoever he—

"will not, within the period of twelve (12) months from the date of the termination of such employment, engage as principal, agent or employee in any business competing or capable of competing with that of the Employer, nor act as agent, demonstrator, instructor, sales person, representative or otherwise for any person, firm or corporation, which manufactures, sells, develops, distributes

or deals in hair colorings or any other products capable of competing with those products sold by Roux Distributing Co., Inc. in any territory or area in which District Manager had been engaged in behalf of Employer within a period of twelve (12) months prior to the termination of this employment;"

Defendant maintains no office in Minnesota. It has no telephone listing, but in 1950 it arranged for a telephone message service. Representatives of defendant would leave a card with a cosmetic dealer or beauty parlor stating that, by calling a designated telephone number on the card, messages could be given to telephone answering exchange and that defendant's representatives would telephone for such messages from time to time and thereafter contact the caller.

Schusser was required to make regular reports to the New York office. His itinerary for stated periods was likewise reported. While the actual hiring of employees working under Schusser was done by the New York office, it was Schusser's responsibility to keep the staff up to the required number. If an employee resigned, Schusser would contact someone else. He would sometimes advertise in the papers for such help and would then recommend their employment to the home office. As a general rule, the company followed his recommendation on such matters. He and other members of the staff would train new employees.

The action arises out of alleged breach of warranty in the sale of a bottle of Roux hair dye. The dye was sold in a paper carton containing two small bottles of dye. In the carton was inserted a small pamphlet or booklet containing instructions for the use of the dye. On the bottle itself we find the following statement:

"CAUTION: This product contains ingredients which may cause skin irritation on certain individuals and *a preliminary test* according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows; to do so may cause blindness." (Italics supplied.)

On one side of the box in which the bottles were contained we find the same cautionary statement as is found on the bottle. On the opposite side of the box we find the following:

"GUARANTEE

"ROUX HAIR DYE

"is guaranteed to be compounded from the finest and purest ingredients obtainable in the chemical market. Every precaution has been taken to make this preparation the acme of scientific perfection.

"READ ENCLOSED DIRECTIONS CAREFULLY BEFORE USING"

The pertinent portion of the book of instructions is the following:

"ROUX Hair Dye

"Exquisite new color in one application

"The thrill of young looking hair! Few things 'type' a woman more definitely or dramatically than gray hair. Symbol of age, it is the smart woman's chief obstacle to a vital sparkling youthful appearance.

"You overcome this obstacle with ROUX Hair Dye. Lovely and lustrous, this color-treatment imparts a natural-looking shade, brings back the thrill of young-looking hair. Accurate, uniform, dependable, free from metallic salts, ROUX Hair Dye is fast to sunlight, saltwater and perspiration. And it leaves the hair soft and pliable, so it can be waved and treated exactly like uncolored hair.

"For best results, directions given herein must be carefully followed.

"THE PRELIMINARY OR PATCH TEST

"Medical science has established the fact that a susceptible person may be allergic to even the simplest product. Of the millions of persons using or contemplating the use of hair colorings, a limited few may be allergic or hypersensitive to them. The common method used by medical authorities in detecting those hypersensitive persons is by a preliminary or patch test. Therefore, before contacting or using this product, a test, in strict accordance with the following directions, should be made.

"The Patch Test

"In order to ascertain whether you are hypersensitive to this product, the following test should be made *before every application:* [Italics supplied.]

"1—With a bland soap and water, wash an area about the size of a quarter on the inner fold of the elbow or behind either ear and extending partly into the hairline. Dry by patting with absorbent cotton.

"2—Prepare the test solution by mixing equal proportions of ROUX Hair Dye and 20 Volume Hydrogen Peroxide. (A few drops of each is sufficient for this purpose.)

"3—With an absorbent cotton-tipped applicator, apply the test solution to the previously cleaned area.

"4—Permit the test area to dry. Leave uncovered and undisturbed for 24 hours.

"5—Then examine the test area within the next 24 hours. If found negative, the application of the Dye must then be made immediately.

"If any burning, itching, swelling, irritation, eruption or abnormal reaction is experienced in or around the test area at any time during the test period, then you are hypersensitive to this preparation and MUST NOT use this product. ROUX Hair Dye should not be applied to the hair where the scalp or adjacent area shows evidence of any abrasion, eruption or other abnormal or diseased condition."

Thereafter follow instructions with respect to the selection of the proper shade, which are not material here. Then follows "APPLICATION ON VIRGIN HAIR," and detailed instructions are given for the application of the dye on virgin hair. The next instruction is as follows:

"APPLICATION FOR RETOUCHING

"The new hair which grows in after an application of ROUX Hair Dye will be the same color as the hair was before being

colored. To retouch this new growth, follow the instructions given for application on virgin hair."

Thereafter follow further instructions with respect to the proper manner in which to apply the dye for a retouching.

Plaintiff had used various types of hair dye for several years prior to April 7, 1948. Sometime in March 1948 she went to a beauty parlor in St. Paul and there became acquainted with Roux hair dye for the first time through the operator. She was given a so-called "patch test" by the application of a small amount of the dye, properly mixed, behind her ear and on the inside of her elbow. After waiting for 24 hours she returned, and since she had not had any adverse reaction, the operator proceeded to apply the dye to her hair. No adverse effects followed. Later that month plaintiff purchased a bottle of Roux hair dye at a drugstore and used it for retouching the hair where it had grown out. Before using it, she carefully read the book of instructions but did not understand that she was required to give herself another patch test so she did not do so. No adverse effects followed this application. On April 7, she again purchased a bottle of the same dye from a drugstore, and the next day without a patch test, she proceeded to retouch her hair again. This was done about 2 p. m. About 5 p. m. her eyes began to burn and to get bloodshot and started swelling up. She went to a doctor, who was of the opinion that she was allergic to something. She later broke out all over with small sores. Inasmuch as defendant does not contend that the verdict is excessive, we need not relate in more detail the nature of plaintiff's injuries.

The trial court determined as a matter of law that the instructions contained in the booklet which was enclosed in the box did not require a patch test prior to a retouching.

The jurisdictional question divides naturally into two points:

(1) Was the corporation doing business in Minnesota so as to be amenable to suit?

(2) Was Joseph B. Schusser an agent upon whom process could be served?

■ The problem of determining when a corporation is doing business in a foreign state to such an extent as to become amenable to suit in such state has always been a troublesome one, and no rule has yet been formulated which will fit all cases. To begin with it was thought that a corporation could have no existence outside the state of its origin.[2] Thereafter for a time it was held that, when a corporation entered a foreign state to transact business, it impliedly consented to service of process upon it in such state.[3] Then there was evolved a theory that, when the corporate activities were carried on to such an extent that an inference could be drawn that it was present in the state of the forum, it became amenable to suit therein.[4]

At best, the concept of amenability to suit by virtue of the presence of a corporation in the foreign state has been a fictitious and unsatisfactory rule born of necessity because of the ever-expanding activities of corporations across state lines and the injustice of depriving a citizen of one state of the right to sue a corporation causing it harm without going to the state of origin of the corporation. The concept was nurtured in an atmosphere of uncertainty which has required a decision of a court of last resort in almost every case before it could be said with finality that the corporation was subject to suit. Now, apparently, the concept of presence in the state of the forum has also been abandoned for a more realistic approach to the problem. See, McBaine, *Jurisdiction over Foreign Corporations,* 34 Calif. L. Rev. 331, 333-335. Most of the leading cases on the subject based on the concept of cor-

[2]Bank of Augusta v. Earle, 38 U. S. (13 Pet.) 519, 588, 10 L. ed. 274, 308; Henderson, The Position of Foreign Corporations in American Constitutional Law, p. 77.

[3]Lafayette Ins. Co. v. French, 59 U. S. (18 How.) 404, 15 L. ed. 451; Henderson, The Position of Foreign Corporations in American Constitutional Law, p. 77; McBaine, *Jurisdiction over Foreign Corporations,* 34 Calif. L. Rev. 331, 336-337.

[4]Philadelphia & Reading Ry. Co. v. McKibbin, 243 U. S. 264, 37 S. Ct. 280, 61 L. ed. 710; McBaine, *Jurisdiction over Foreign Corporations,* 34 Calif. L. Rev. 331, 336; Dahl v. Collette, 202 Minn. 544, 279 N. W. 561.

porate presence in the state are collected in Dahl v. Collette, 202 Minn. 544, 279 N. W. 561, *supra,* and we need not repeat what was said there.

Since this problem involves a determination of due process under the federal constitution, we are governed by the decisions of the United States Supreme Court. Dahl v. Collette, *supra.* While there have been many indications in the decisions that there was a growing dissatisfaction with the concept that a corporation must be present before it was amenable to suit,[5] the final abandonment of that fictitious theory rests upon the decisions of the United States Supreme Court in International Shoe Co. v. Washington, 326 U. S. 310, 66 S. Ct. 154, 90 L. ed. 95, 161 A. L. R. 1057.[6] That case affirmed the supreme court of the state of Washington (22 Wash. [2d] 146, 154 P. [2d] 801) in holding that a foreign corporation was amenable to suit under the facts therein presented.

The facts in that case, as found by the Washington court and upon which the decision of the United States Supreme Court rests, are these: Defendant was a Delaware corporation having its principal place of business in St. Louis, Missouri, and engaged in the manufacture and sale of shoes and other footwear. It maintained places of business in several states, other than Washington, at which its manufacturing was carried on and from which its merchandise was distributed interstate through several sales units or

[5]Cf. Farmers' & Merchants' Bank v. Federal Reserve Bank (D. C.) 286 F. 566.

[6]McBaine, *Jurisdiction over Foreign Corporations,* 34 Calif. L. Rev. 331, 333-335; 21 N. Y. U. L. Q. Rev. 442; 16 U. of Chicago L. Rev. 523; 59 Yale L. J. 737, 740; 60 Yale L. J. 908; 64 Harv. L. Rev. 500, 501; 41 Ill. L. Rev. 228, 236. For other discussions of the International Shoe Co. case, see 20 U. of Cincinnati L. Rev. 129, 131; 23 N. Y. U. L. Q. Rev. 336, 337; 23 St. John's L. Rev. 126, 131; 20 Tulane L. Rev. 437.

See, also, United States v. Scophony Corp. 333 U. S. 795, 68 S. Ct. 855, 92 L. ed. 1091; Travelers Health Assn. v. Virginia ex rel. State Corp. Comm. 339 U. S. 643, 70 S. Ct. 927, 94 L. ed. 1154; Polizzi v. Cowles Magazines, Inc. 345 U. S. 663, 73 S. Ct. 900, 97 L. ed. 1331 (see, especially, dissenting opinions).

branches located outside the state of Washington. Defendant had no office in Washington and made no contracts either for sale or purchase of merchandise there. It maintained no stock of merchandise in that state and made no deliveries of goods in intrastate commerce. During the years from 1937 to 1940, which were the years in question in the case, defendant employed from 11 to 13 salesmen under direct supervision and control of sales managers located in St. Louis. These salesmen resided in Washington; their principal activities were confined to that state; and they were compensated by commissions based upon the amount of their sales. The commissions for each year totaled more than $31,000. Defendant supplied its salesmen with a line of samples, each consisting of one shoe of a pair, which they displayed to prospective purchasers. On occasions, they rented permanent sample rooms in business buildings for exhibiting samples, or they rented rooms in hotels or business buildings temporarily for that purpose. The cost of such rentals was reimbursed by defendant. The authority of the salesmen was limited to exhibiting their samples and soliciting orders from prospective buyers at prices and on terms fixed by defendant. The salesmen transmitted the orders to defendant's office in St. Louis for acceptance or rejection; and when the orders were accepted, the merchandise for filling the orders was shipped f. o. b. from points outside Washington to the purchasers within that state. All the merchandise shipped into Washington was invoiced at the place of shipment, from which collections were made. No salesmen had authority to enter into contracts or to make collections.

In holding that such activities were sufficient to render the corporation amenable to suit, the United States Supreme Court said (326 U. S. 316, 66 S. Ct. 158, 90 L. ed. 102) :

"Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact, Klein v. Board of Supervisors, 282 U. S. 19, 24, it is clear that unlike an individual its 'presence' without, as well as within, the state of its origin can

be manifested only by activities carried on in its behalf by those who are authorized to act for it. To say that the corporation is so far 'present' there as to satisfy due process requirements, for purposes of taxation or the maintenance of suits against it in the courts of the state, is to beg the question to be decided. For the terms 'present' or 'presence' are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process. L. Hand, J., in Hutchinson v. Chase & Gilbert, 45 F. 2d 139, 141. Those demands may be met by such contacts of the corporation with the state of the forum as to make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there. An 'estimate of the inconveniences' which would result to the corporation from a trial away from its 'home' or principal place of business is relevant in this connection. Hutchinson v. Chase & Gilbert, *supra*, 141.

" 'Presence' in the state in this sense has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given. * * *

* * * * *

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. * * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations. * * *

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

This new approach to the problem probably had its real inception in Hutchinson v. Chase & Gilbert, Inc. (2 Cir.) 45 F. (2d) 139, 141, cited with approval in the above case, where Judge L. Hand said:

"It scarcely advances the argument to say that a corporation must be 'present' in the foreign state, if we define that word as demanding such dealings as will subject it to jurisdiction, for then it does no more than put the question to be answered. * * *

"When we say, therefore, that a corporation may be sued only where it is 'present,' we understand that the word is used, not literally, but as shorthand for something else. It might indeed be argued that it must stand suit upon any controversy arising out of a legal transaction entered into where the suit was brought, but that would impose upon it too severe a burden. On the other hand, it is not plain that it ought not, upon proper notice, to defend suits arising out of foreign transactions, if it conducts a continuous business in the state of the forum. * * *

"* * * We are to inquire whether the extent and continuity of what it has done in the state in question makes it reasonable to bring it before one of its courts. Nor is it anomalous to make the question of jurisdiction depend upon a practical test. * * * it seems to us that nothing is gained by concealing what we do by a word which suggests an inappropriate analogy, that is, the presence of an individual who may be arrested and compelled to obey. This does not indeed avoid the uncertainties, for it is as hard to judge what dealings make it just to subject a foreign corporation to local suit, as to say when it is 'present,' but at least it puts the real

question, and that is something. In its solution we can do no more than follow the decided cases.

"Possibly the maintenance of a regular agency for the solicitation of business will serve without more. The answer made in Green v. C., B. & Q. R. R. Co., 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916, and People's Tob. Co. v. Amer. Tobacco Co., 246 U. S. 79, 38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537, perhaps becomes somewhat doubtful in the light of International Harvester Co. v. Kentucky, 234 U. S. 579, 34 S. Ct. 944, 58 L. ed. 1479, and, if it still remains true, it readily yields to slight additions."

It may be that mere solicitation is now enough when carried on systematically and continuously for such a period of time and to such an extent that it would seem just to subject the corporation to a suit in the state where the soliciting is done. The Washington court was of the opinion that solicitation alone should suffice but found it unnecessary to place the decision on that basis alone. The court said (22 Wash. [2d] 169, 154 P. [2d] 812):

"While we are of the opinion that the regular and systematic solicitation of orders in this state by appellant's agents, resulting in a continuous flow of appellant's products into this state by means of interstate carrier, is sufficient to constitute doing business in this state so as to make appellant amenable to process of the courts of this state, we are also of the opinion that there are additional activities shown which bring this case well within the solicitation plus rule."

While Nippert v. City of Richmond, 327 U. S. 416, 426, 66 S. Ct. 586, 591, 90 L. ed. 760, 766, decided shortly after the International Shoe Co. case, did not involve the question here under consideration, the language of the court in that opinion is significant. Mr. Justice Rutledge, writing for the court, there said:

"In view of the ruling in International Shoe Co. v. Washington, *supra*, we put aside any suggestion that 'solicitation,' when conducted regularly and continuously within the State, so as to con-

stitute a course of business, may not be 'doing business' just as is the making of delivery, * * *."

See, also, McBaine, *Jurisdiction over Foreign Corporations*, 34 Calif. L. Rev. 331, 335; 16 U. of Chicago L. Rev. 525.

Defendant argues that the International Shoe Co. case is distinguishable from this case on the facts in that here there was no solicitation of business. That is not completely accurate since the evidence shows that the employees of defendant did take orders on occasions and that, when such orders were taken from retailers, they were turned over to wholesalers or jobbers and filled by them out of stock which they had on hand. If the orders were taken from wholesalers or jobbers they were turned over to defendant and filled by it. Had the activities of defendant's employees been coupled with solicitation of orders, there could be little doubt that the International Shoe Co. case would be controlling. Whether solicitation alone is now enough, if conducted systematically and continuously, we need not determine.[7] But to say on the one hand that solicitation alone is not enough to constitute doing business, as has been said in prior cases; on the other hand that activities such as we have here, standing alone without solicitation, do not constitute business; but that, if the two be combined, they become by some sort of legal alchemy the doing of business involves reasoning which no one engaged in business would accept nor should we. Systematic solicitation of orders is carried on for only one purpose, namely, the sale of goods. Similarly, the type of activities involved here has the same goal. The sale of goods and the continuous and systematic shipment of such goods into this state is, and ought to be recognized as, the doing of business in this state. Similarly, activities such as we have here is, and ought to be recognized as, the doing of business. We believe that the proper application of the rule laid down in the International Shoe Co. case will lead to that result, even though the solicitation of orders in this case constituted a minor role in the activities of defendant's employees. It is

[7] See, 60 Yale L. J. 909; 39 Ky. L. J. 357; 18 Fordham L. Rev. 204.

obvious that they were here for only one purpose; namely, to encourage the use of defendant's products and stimulate the sale thereof. Their activities resulted in the shipment of a substantial volume of goods into this state. That should be sufficient to constitute the doing of business. While the new rule may still leave the determination of the question in the realm of uncertainty in many cases, it "at least * * * puts the real question, and that is something." Hutchinson v. Chase & Gilbert, Inc. (2 Cir.) 45 F. (2d) 139, 141, *supra*.

◼ We have no difficulty with the second point of the jurisdictional question. In Dahl v. Collette, 202 Minn. 544, 552, 279 N. W. 561, 567, *supra*, we said:

"Our statute permits service upon any agent of a foreign corporation doing business within this jurisdiction which is of such character that authority to accept service on its behalf may be implied. This requires that the agent served be of such representative capacity that it is reasonably certain that notice to him will be communicated to his principal."

That Schusser was such an agent is too well established to require further comment.

◼ On the merits, the appeal presents principally these questions:

(1) Did the court err in construing the instructions for using the dye as a matter of law instead of submitting the question to the jury as a question of fact?

(2) Is the court's construction of the instructions supported by the evidence?

(3) Is the verdict of the jury supported by the evidence?

Defendant now contends that the court erred in passing upon the adequacy of the instructions furnished by defendant as a matter of law, it being defendant's position here that the adequacy of the warning should have been submitted to the jury.

· At the close of the case defendant moved to strike certain testimony of a witness regarding the custom of applying a patch test

before a retouching. Defendant also moved for a directed verdict. Thereupon, the following discussion and ruling of the court took place:

"Court: May I ask this question before I rule on that? It is the Court's present view that the construction of the book of instructions accompanying the package depends entirely upon the language of the pamphlet. Therefore, it presents only a question of law for the Court, and before I rule is there going to be any argument by either counsel designed to induce the Court to change his mind on that subject?

"Mr. Hammond: Yes sir.

"Court: In other words, you think the construction might be a question for the jury, or do you claim—you—I realize you disagree with what I thought would be my construction, but do you disagree with the construction of the pamphlet? Is there a question of law for the Court, and do you claim it is a question of fact for the jury in any respect?

"Mr. Hayes: I feel that as a matter of law on the evidence produced here by this plaintiff she has failed to show, and she has failed to carry the burden cast upon her requiring her before any recovery whatsoever can be had to show that she has reasonably complied with the labeling on and in the package purchased by her, which includes, of course, the labeling on the bottle itself now in evidence, and also the printed matter in the booklet of instructions, and I, in behalf of the defendant, merely as trial counsel, do not concede that here question is raised, a question of fact, for the jury as to whether or not she complied with the instructions, but—

"Court: Well, departing from the inquiry, I am interested now only in the question of whether counsel disagree with me that under the evidence the construction of the pamphlet, and the language therein, is a matter of law for the Court, or do either counsel claim that the construction of the pamphlet presents any question of fact for the jury."

Then followed some motions for a directed verdict, after which the court again said:

"Court: There is a motion here that seems to me presents a clear-cut question as to the construction of the terms of the pamphlet of instructions. If the pamphlet is to be construed as it is claimed, then it is obvious that the Court must direct a verdict for the defendant, because it is not disputed here that the plaintiff did not use or take a patch test before this application. So it seems to me we get down as far as this motion is concerned to one question; that is the proper construction of the pamphlet, and I take it that is a matter of law that the Court has got to determine; that there is no question of fact for the jury.

"Mr. Hammond: Well, I am inclined to your belief, Your Honor, * * *."

The court then said:

"Court: I am of the opinion that a decision of this matter depends absolutely on the construction of the book of instructions accompanying the package; that that construction must be made of language of the pamphlet itself, and that there are no extraneous facts that can be considered in this case in arriving at the construction. Therefore, there is a flat question of law presented. If the instructions are to be construed as meaning that the user is instructed to have a patch test taken before each retouching of the hair with the dye, then the motion must be granted, and a verdict directed for the defendant.

"On the other hand, this Court construes this pamphlet to mean that the user is not warned or instructed to have a patch test taken before each retouching, and it is the duty of the Court to so rule as a matter of law, as in determining what the pamphlet means we have to bear in mind certain well-established rules of construction, and one is that where a document is prepared solely by one party, and if there is any ambiguity in it that ambiguity must be resolved against the person who drew the document. * * *

"In view of the Court's ruling on that question, namely that the consideration is entirely dependent upon the language of the pamphlet, the evidence of Mrs. Copeland tending to show some practice of the defendant's employees not to insist upon a patch test, becomes immaterial, and the Court will grant the motion to strike that testimony."

No exception was taken to the court's construing the instructions as a matter of law, nor was any request made to submit the question to the jury. Exceptions were taken to the court's instructions to the jury which construed the language of the book of instructions as a matter of law. It seems clear that at the time of the trial counsel for both parties were of the opinion that the question was one of law for the court and not a question of fact for the jury. Defendant should not now be permitted to question the manner in which the issue was determined.

The crucial question is whether the court's construction of the language used in the instructions was correct. The language contained in the book of instructions was chosen by defendant. Therefore, if it is ambiguous, it should be construed against the one who chose the words used.

The instructions relating to the patch test are headed by the words "THE *PRELIMINARY* OR PATCH TEST." (Italics supplied.) The first paragraph provides, after warning the user that a few people may be allergic or hypersensitive to the product's use, that *"before contacting or using* this product, a test, in strict accordance with the following directions, should be made." (Italics supplied.) Then follow instructions entitled "The Patch Test." The first sentence thereof reads:

"In order to ascertain whether you are hypersensitive to this product, the following test should be made before every application."

Thereafter follow detailed instructions for giving the patch test.

The portion of the instructions relating to retouching is headed "APPLICATION FOR RETOUCHING." The important statement is the first sentence, which reads:

"The new hair which grows in *after an application* of ROUX Hair Dye will be the same color as the hair was before being colored. To retouch this new growth, follow the instructions given for application on virgin hair." (Italics supplied.)

There is no reference to the patch test in either the paragraph dealing with application for virgin hair or with application for retouching.

It is apparent that the instructions are ambiguous and that it is far from clear whether it was intended to require a patch test before a retouching. Use of the word "preliminary" in the first part of the instructions would imply that the test was required prior to an original application. While the instructions state that the test should be given before every application, the use of the language "after an application" in the instructions relating to retouching could well lead one to assume that the word "application" meant original application, particularly when read with the word "preliminary." We have not overlooked the fact that the word "application" is used also in the heading of the instructions relating to retouching, but this simply adds to the confusion. The court's determination that the instructions did not require a patch test prior to a retouching—having in mind the rule which requires construction against the one who chose the words used—is sufficiently sustained by the evidence. If a patch test was to be required before a retouching, it should have been a simple matter to so state in clear language.

■ Defendant raises the question whether or not a seller or manufacturer of a product of this kind is liable for injuries resulting to one who is allergic to the product. We need not determine that question. After having made a preliminary determination that the book of instructions did not require a patch test before a retouching, the court submitted the case to the jury on the theory of a breach of warranty, in conformity with the pleadings. The theory upon which the case was tried was that defendant had warranted the dye to be safe if used in accordance with the instructions and that plaintiff, having so used the particular bottle in-

volved herein, nevertheless was injured. While there is a conflict in the authorities as to the proof required in a case of this kind, we are committed to the more liberal rule that proof of the harmful ingredients in the particular bottle or container causing the harm is not required. Pietrus v. J. R. Watkins Co. 229 Minn. 179, 38 N. W. (2d) 799. This rule is particularly applicable here. The evidence is undisputed that shortly after plaintiff suffered the harmful reaction from the dye she wrote to defendant company. Two representatives of the company called on her and took a statement from her. At that time they also picked up the unused bottle and the empty bottle from which she had used the dye. Thereafter she had no opportunity to procure an analysis of it and defendant offered no evidence of an analysis. Under such circumstances, proof of the result of the product's use should suffice to establish a breach of warranty that it was safe for use. We believe that the evidence is sufficient to sustain the finding of the jury of a breach of warranty.

Affirmed.

MR. JUSTICE CHRISTIANSON took no part in the consideration or decision of this case.

MR. JUSTICE NELSON, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.