DOROTHY HARTMON v. NATIONAL HEATER COMPANY
AND OTHERS.
MID-CONTINENT METAL PRODUCTS COMPANY,
APPELLANT.[1]

October 30, 1953.

No. 35,750.

[1]Reported in 60 N. W. (2d) 804.

*Richards, Janes, Hoke, Montgomery & Cobb* and *Melvin D. Hecht,* for appellant.

*Grannis & Grannis,* for respondent.

CHRISTIANSON, JUSTICE.

This case comes to the writer on reassignment following the summer recess.

Action for wrongful death is brought by the special administratrix of the estate of Leonard Hartmon to recover for the latter's death which resulted when an accumulation of propane gas within a furnace exploded. The action was brought against Mid-Continent Metal Products Company, manufacturer of the gas conversion burner here involved, and three other named defendants.

Service upon Mid-Continent Metal Products Company was made by handing copies of the summons and complaint to Donald R. Bayers, alleged to be its agent in Minnesota. Shortly thereafter the company appeared specially and moved to set aside this service on the ground that it was not engaged in business in Minnesota, had no officers or agents here, and was not subject to the jurisdiction of the Minnesota courts. This motion was denied.

At the close of plaintiff's case, the trial court granted the motion of one defendant for dismissal and the motion of another defendant for a directed verdict and denied motions for directed verdicts on behalf of Mid-Continent Metal Products Company and the other defendant. The jury returned a verdict for plaintiff against Mid-Continent Metal Products Company alone. The trial court denied Mid-Continent Metal Products Company's alternative motion for judgment notwithstanding the verdict or for a new trial, and Mid-Continent Metal Products Company, hereinafter referred to as defendant, appeals from the judgment subsequently entered.

The pertinent facts appear as follows: On the morning of March 16, 1949, decedent and two other members of the Congregational Church of Cottage Grove arrived at the church to aid in its remodeling. A gas conversion burner manufactured by defendant had been previously installed and was ready for use. Because of the cold weather, decedent and the other two men attempted to start the burner. In the attempt, decedent temporarily removed a plug, hereinafter referred to as plug P, from the burner which al-

lowed gas to escape through the diaphragm valve into the combustion chamber of the furnace where it subsequently exploded. As a result of the explosion, decedent was struck by an inspection door of the furnace and was fatally injured.

The explosion expelled the burner in question from the furnace but did not damage it, and it is before us as an exhibit in the case. A description of the burner and its operation is essential to the consideration of this case. It was designed for use in homes and small buildings. The propane gas is stored in a tank located outside of the building. The storage tank and the main gas line on the burner are connected by tubing. A shutoff valve is located at the storage tank. The main gas line on the burner passes through a pressure regulator, a manually operated valve (main hand valve), and an electrically operated diaphragm valve which are in line across the top of the burner. The pilot gas line is tapped into the main gas line near its junction with the connecting tubing. The pilot gas line passes through a pilot regulator, a manually operated valve (pilot cock), and a centrifugally operated pilot valve.

The burner is equipped with an electrically ignited intermittent pilot. The burner is completely shut down between calls for heat. When there is a call for heat, the following sequence of events takes place: (1) The motor starts, (2) the ignition coil heats, (3) the pilot valve is opened, (4) the pilot flame is ignited, (5) the diaphragm valve is opened. If the motor fails to reach operating speed, if the ignition coil fails to ignite the pilot flame, or if the pilot flame is extinguished, the electric relay trips out and the burner is in safety shutdown. When the burner is in safety shutdown, a manual reset button must be pressed before the burner will start a new cycle.

The electrically operated diaphragm valve consists of an upper and lower half separated by a synthetic rubber diaphragm. A small portion of the gas flow is diverted from the main gas line into the upper half of the diaphragm valve where it provides the downward pressure on the diaphragm which keeps the valve closed. When the electrical circuit is closed, this gas is released and flows

into the combustion chamber. This relieves the pressure on the diaphragm and the main gas flow passes through the lower half of the diaphragm valve directly into the combustion chamber. Plug P is screwed into the upper half of the diaphragm valve on the side facing the operator of the burner. It is three-eighths of an inch in diameter, has a square head, and extends outward from the valve about one-half inch. It is threaded at the end and can be removed by using either a wrench or pliers. Although plug P served a useful function when this type of diaphragm valve is used with some other burners, it is a useless appendage on this burner. The removal of plug P nullifies all the safety devices on the burner. It releases the gas in the upper half of the valve and allows the main gas flow to pass through the lower half of the valve into the combustion chamber while only the small amount of gas in the upper half of the valve flows out of the opening created by the removal of plug P.

Defendant furnished instructions with the burner consisting of four sheets of 8½-by-11 paper stapled together with reproduced typewriting on the front side of each sheet. They are before us as an exhibit in the case. The general heading of the instructions is: "OPERATING INSTRUCTIONS FOR LO-BLAST BURNERS WITH ELECTRIC IGNITION—100% SHUT-OFF." The top half of the first page is devoted to a general explanation of the electrically ignited intermittent pilot, the sequence of events, and the safety shutdown. The bottom half of the first page is entitled "INSTALLATION OF BURNER" and contains instructions with reference to the physical installation and the electrical hook up. Near the top of the second page and continuing onto the third page is a section entitled "INITIAL START UP" which includes 16 numbered instructions. In part they provide as follows:

"1. The burner leaves the factory with the pilot regulator and blower air shutter adjusted. Normally no further adjustment is necessary for the initial start up.

"2. Make sure the gas line is completely purged of air.

\* \* \* \* \*

"8. Set thermostat above room temperature. The motor will start up and open the pilot gas valve. The pilot should light within a few seconds. If pilot does not light immediately allow this operation to continue since the delay may be caused by air in the pilot line. After about 30 seconds of non-ignition the relay will go into safety shut-down, cutting the current to the motor and ignition circuit. Allowing about one minute delay press the manual reset button located in the top center of the relay case. This will restart the unit and the pilot should light as soon as the pilot line is bled free of air."

The third page contains a section entitled "To SHUT DOWN PERMANENTLY" and also a section entitled "NORMAL STARTING PROCEDURE" which provides as follows:

"1. Open pilot cock.
"2. Close control switch.
"3. Open main hand valve."

The last section entitled "TROUBLE CHART" begins on page 3 and extends onto page 4.

Decedent and the other two men had been informed that upon opening the valve at the storage tank and closing the control switch, the burner would start. Apparently the burner was in safety shut-down for nothing happened when they performed these two acts. They then read the instructions. Following this, they turned on the pilot cock and the main hand valve. This completed the instructions under the section entitled "NORMAL STARTING PROCEDURE," and still nothing happened. Pursuant to instruction No. 8 under "INITIAL START UP" they pressed the manual reset button. The motor started, ran for a short period, and went into safety shut-down. Still following the instruction, they repeated this operation several times; each time the motor would start and then go into safety shutdown. Since nothing in the instructions or on the burner indicated the open or closed positions of the pilot cock or the main hand valve, they repeated this operation with these valves in the alternative positions with identical results. At this point, they

reread the instructions. They concluded that there was air in the gas line and that, therefore, it would be necessary to purge the gas line of air pursuant to the instructions under "INITIAL START UP." They turned the pilot cock and the main hand valve to what they had correctly assumed initially were the open positions. Decedent removed plug P to purge the gas line of air, unaware that the main gas flow would escape through the lower half of the diaphragm valve into the combustion chamber. He then replaced plug P. When they pressed the manual reset button again, the burner ignited the free gas in the combustion chamber and the explosion resulted. The evidence indicates that a probable reason for the burner's not starting previously was either that the motor was cold and failed to come up to sufficient speed to get the gas to the pilot light or that the ignition coil did not heat sufficiently to ignite the pilot light. Although defendant contends that it was not a proper way to bleed the line of air, it concedes that the gas line could be purged of air by the removal of plug P.

As previously noted, service upon defendant, a foreign corporation, was obtained by handing copies of the summons and complaint to Donald R. Bayers. Bayers is a manufacturer's representative who represented defendant, among others, on a commission basis. He was held out to defendant's customers as its Minnesota representative and was so regarded by them. Bayers systematically and continuously solicited the sale of defendant's products within the state of Minnesota. He was the source of information regarding defendant's products within the state and, upon request, he was able to obtain technical help for customers from defendant. Bayers had also investigated complaints—including the one in the instant case—, advised dissatisfied customers as to possible measures to improve the operation of defendant's heating units, and sent the information obtained to defendant. In at least one instance, defendant requested Bayers to obtain information regarding a particular installation. Bayers's activities have resulted in a

continuous and substantial flow of defendant's goods into the state.[2]

■ Defendant's first contention is that it was not doing business in Minnesota and it, therefore, was not amenable to suit in this state. It argues that Bayers was a mere soliciting agent whose sole source of compensation was commissions on sales. It discounts Bayers's additional activities as done without authority and solely as a courtesy to defendant and its customers. This court has recently had occasion to examine at length the amenability to suit of foreign corporations in Schilling v. Roux Distributing Co. Inc. 240 Minn. 71, 59 N. W. (2d) 907. No useful purpose would be served by repeating what was said there. In the instant case, as in the Schilling case, we need not determine whether systematic and continuous solicitation, by itself, is sufficient to constitute doing business. Here defendant had knowledge that Bayers, in addition to soliciting, was performing all the activities which were essential to the continued and successful sale of defendant's goods within the state for the mutual benefit of defendant and himself. Since defendant knowingly accepted the benefit of Bayers's additional activities, we find the evidence sufficient to support the trial court's determination that defendant was doing business within the state at the time of the commencement of this action. See, Schilling v. Roux Distributing Co. Inc. *supra.*

■ Defendant's principal contention is that the evidence is insufficient to support a finding of negligence on its part. Although the parties differ in their application of the law to the facts presented, there is no substantial dispute between them ·as to the principles of law applicable to this case. A manufacturer of a chattel such as we have here is under a duty to exercise reasonable care in adopting a safe plan or design for his chattel. See, Restatement, Torts, §§ 395, 398. Where a manufacturer undertakes by printed instructions to advise of the proper method of using his

[2]Since the affidavits in support of and in opposition to the motion to set aside the service of summons and complaint in some respects conflict, the view favorable to the prevailing party in the trial court has been taken. Dahl v. Collette, 202 Minn. 544, 279 N. W. 561; Massee v. Consumers Hay Co. Inc. 184 Minn. 196, 238 N. W. 327.

chattel, he assumes the responsibility of giving accurate and adequate information with respect thereto, and his failure in this respect may constitute negligence. House v. Wichita Gas Co. 137 Kan. 332, 20 P. (2d) 479; Karsteadt v. Phillip Gross Hardware & Supply Co. 179 Wis. 110, 190 N. W. 844; Miller v. International Harvester Co. 193 App. Div. 258, 184 N. Y. S. 91.

Reasonable care is that degree of care that a reasonably prudent person would exercise under the same or similar circumstances. It must be commensurate with the risks of the situation as they were, or should have been, reasonably anticipated by the actor. If no risk could have been reasonably anticipated as a result of the act or omission, there can be no negligence predicated upon such act or omission. Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N. W. (2d) 73; 4 Dunnell, Dig. & Supp. § 6972.

Since defendant's sales manager admitted at the trial that defendant had knowledge that the removal of plug P would nullify its burner's safety devices and create a hazardous condition, the controlling question presented for decision is whether, in view of defendant's operating instructions, a jury would be justified in finding that defendant reasonably should have anticipated that an operator of its gas burner would remove plug P to purge the gas line of air and that, therefore, defendant was negligent in failing to furnish adequate instructions as to purging the line of air or in failing to take appropriate precautions either to prevent the removal of plug P or to warn against the dangers attendant upon its removal.

Defendant concedes that the burner is designed to be operated by individuals who are inexperienced in the theory and operation of gas burners and who would not know that plug P lacked a purpose on this type of burner. However, it maintains that nowhere in its instructions did it attempt to advise or instruct operators as distinguished from installers of its burner concerning what should be done if the burner failed to start and that operators thereof could reasonably be expected to follow only the directions appearing under the sections entitled "NORMAL STARTING PROCEDURE" and "To SHUT

Down Permanently." It points out that the only reference to purging or bleeding the lines of air is under the section entitled "Initial Start Up" which it asserts was plainly designed for installers of the burner only. However, the title of the instructions begins "Operating Instructions * * *," and they are presented as a single set of instructions with the burner. There is no statement in the instructions indicating which portions are applicable to operators or warning them of possible danger. The section entitled "Normal Starting Procedure" does not completely instruct operators, for there is no reference to the manual resetting operation which is admittedly an appropriate one for all operators to perform. The only reference to this operation is found in the section entitled "Initial Start Up." In view of the ambiguity in defendant's instructions and the fact that there is nothing therein to indicate to whom such directions were applicable, we are of the opinion that a jury would be justified in finding that defendant reasonably should have anticipated that operators would look to the printed instructions in their entirety.

Furthermore, since there is nothing in the instructions to explain how to purge the lines of air or to warn of the dangers attendant upon the removal of plug P, we are of the further opinion that a jury would be justified in finding that inexperienced operators reading defendant's instructions would reasonably believe:

(1) That a possible cause of the burner's failure to operate was air in the lines;

(2) That they could perform the simple mechanical act of removing the air from the lines since there was nothing to the contrary in the instructions;

(3) That because of plug P's prominent and conspicuous position in relation to the main gas line, the purpose of plug P was to purge the lines of air.

Under these circumstances we think that it was for the jury to determine whether defendant reasonably should have anticipated that inexperienced operators of its burner would follow the course taken by decedent and, hence, whether it was negligent in failing

to provide a warning as to the dangers attendant upon such course, in failing to furnish adequate instructions as to purging the lines of air, or in failing to add safety features which would have prevented the removal of plug P.

■ Defendant asserts that the trial court erred in receiving certain testimony of Harry R. Dahlberg as an expert witness called by plaintiff. Dahlberg was a graduate of the engineering school of the University of Minnesota and had held an assistant professorship at Oregon State College in the industrial engineering department. He had been employed by the Twin City Testing & Engineering Laboratory for two years where he had tested the burner in question. After Dahlberg had testified with respect to the testing of the burner, he was asked what, if any, safety features could have been added to this burner to make its operation more safe. At this point, defendant interposed the objection that the question did not call for standard practice and that there was an insufficient foundation. The objection was sustained. Thereupon Dahlberg stated that he had tested gas furnaces in accordance with the requirements of the American Gas Association and the Fire Underwriter's Laboratories. Plaintiff then renewed the question, adding the phrase "according to standard practice." Over defendant's objection as to foundation, Dahlberg answered as follows:

"* * * An additional and relatively simple safety feature would be to simply drill a small hole in that plug and wire the plug to the adjacent screws. This is a procedure that is followed in industry, * * *"

"This procedure of wiring plugs and other parts that are extremely critical, and the absence of such plugs would endanger the equipment and life, is followed in many installations and pieces of equipment. It starts at your gas meter."

"Then further, in as much as the plug as so would present a hazardous condition on its removal a red warning sign would be very essential in this case."

"Another safety feature that does not pertain to the burner but to the instructions would be a more specific means of bleeding the

air out of the line, should some one suspect that there is air in this line because the bleeding operation presents a hazardous condition."

"Well, one thing that should be definitely pointed out and that is, should difficulty arise in starting the furnace, they should immediately call the service man, that the layman is not in a position to determine the causes of failure to start."

Cross-examination of Dahlberg subsequently revealed that his experience with gas conversion burners was very limited and that he had little, if any, knowledge of the customs and practices of gas burner manufacturers with respect to the safety features that he had suggested.

The nature and feasibility of safeguards and precautions that could have been taken with respect to a potentially dangerous condition are proper subjects for expert testimony provided that they are not of such common knowledge that the jury is equally capable of judging them. Carlin v. Kennedy, 97 Minn. 141, 106 N. W. 340; Peterson v. Johnson-Wentworth Co. 70 Minn. 538, 73 N. W. 510; Anderson v. Fielding, 92 Minn. 42, 99 N. W. 357, 104 A. S. R. 665. Defendant made no objection to Dahlberg's testimony on the latter ground and did not move to strike the foregoing testimony. In our opinion Dahlberg should have been permitted to answer the initial question asked him. Although the phrase "according to standard practice" was added to the question, Dahlberg's answer was responsive to the initial question. His testimony on cross-examination dispelled any doubt about it and made it clear that he was testifying solely as to what could have been done with the particular burner in question and not what was done by gas burner manufacturers generally. On this state of the record it is our opinion that defendant is in no position to urge that the trial court committed reversible error in receiving this testimony. Furthermore, the qualification of an expert witness is a matter lying largely in the discretion of the trial court, and we find nothing to indicate that such discretion was abused with respect to Dahlberg's testimony.

■ Defendant also contends that it was error to exclude the testimony of C. F. Peterson, defendant's sales manager, to the

effect that the American Gas Association had no regulations requiring installation of plates warning of the dangers attendant upon the removal of parts on gas burners similar to plug P. The record indicates, however, that the witness actually answered the question in the negative, and that, although objection thereto was thereafter sustained, the answer already given was never stricken. It would follow that the error, if any, was without prejudice. Nubbe v. Hardy Continental Hotel System, 225 Minn. 496, 31 N. W. (2d) 332.

Defendant further contends that it was error to reject this witness's testimony to the effect that defendant had at no time received reports of accidents or explosions resulting from the removal of plug P. Peterson had previously testified:

"If there had been an explosion we would have heard about it and it would have had to have been an explosion if there was a plug out."

While the witness did not actually state that there had been no reports of explosions, the only reasonable inference which could be drawn from the above testimony was that no explosion had ever occurred. Since the rejected testimony was merely cumulative of the witness's prior testimony which had been received and from which the jury could have perceived the fact sought to be again established by the rejected testimony, no harm resulted from the court's ruling, and the rejection of such testimony did not constitute reversible error. 1 Dunnell, Dig. (3 ed.) §§ 416, 422.

■ Defendant assigns as error the rejection of certain testimony offered by Joe Dufour who was called as an expert witness for defendant. Dufour was asked whether in his experience in the installation of 200 gas-fired burners he had ever seen any with warning tags thereon or any so welded or wired as to make it impossible to remove parts thereof and whether it was the custom and practice of oil burner manufacturers in this community to place stickers or tags upon burners warning against the removal of parts. Objections to these questions and several others of a similar nature were sustained on the ground that the testimony sought thereby

was irrelevant, immaterial, and that there was not sufficient foundation as to the qualifications of the witness.

The observance of a custom or failure to observe it does not necessarily amount to due care or the lack of it, but such evidence is admissible as tending to show what a reasonably prudent person would do under the same or similar circumstances. Kelly v. Southern Minnesota Ry. Co. 28 Minn. 98, 9 N. W. 588; 4 Dunnell, Dig. & Supp. § 7049, and cases there collected; Annotation, 137 A. L. R. 611.

It is well established that whether a witness qualifies as an expert ordinarily is a question to be decided by the trial court, and its ruling thereon will not be reversed on appeal unless it is based on some erroneous view of the law or is clearly not justified by the evidence. Woyak v. Konieske, 237 Minn. 213, 54 N. W. (2d) 649; Koenigs v. Thome, 226 Minn. 14, 31 N. W. (2d) 534; 7 Dunnell, Dig. (3 ed.) § 3335. The record discloses that, although Dufour testified that he had made about 200 installations of gas burners, his work in conjunction therewith related only to the electrical wiring, and his observation of the customs and practices of gas burner manufacturers was a mere incident of his employment as an electrician to perform the electrical work. In view of this, we cannot say that the trial court's conclusion that Dufour was not sufficiently qualified to testify as to customs and practices within the gas burner industry is clearly not justified by the evidence.

■ Defendant also assigns as error the rejection of the testimony of I. J. Erickson, deputy state fire marshal, who was called as a witness by defendant. Erickson was asked whether he knew of any rule or regulation of the state fire marshal's office requiring in effect that removable parts of a gas burner should be wired, fastened, or sealed so as to make them irremovable or that signs should be placed on gas burners warning operators not to remove parts of the burner. Plaintiff's objections to these and similar questions on the ground that the testimony sought was incompetent, irrelevant, and immaterial were sustained by the trial court.

While the offered testimony might be proper as tending to establish custom and practice within the gas burner industry, the relevancy of evidence as to custom and practice within an industry is necessarily predicated upon the assumption that the circumstances presented in the case at bar are the same or similar to those prevailing throughout the industry in the area encompassed by the custom and practice. In the instant case, the right to recovery is predicated upon plaintiff's theory that, in view of defendant's operating instructions and plug P's prominent and conspicuous position in relation to the main gas line of the burner in question, a reasonably prudent person would foresee that operators would remove plug P in an effort to purge the lines of air. Since these instructions are apparently unique to this defendant, the trial court in its discretion could have concluded that this was not an appropriate case for such testimony as to custom and practice throughout the industry. Therefore, we find no grounds for reversal in the trial court's rulings with respect to the offered testimony.

Defendant's other assignments of error have been carefully considered and found not to justify a new trial. Accordingly, the judgment appealed from should be affirmed.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that the evidence fails to sustain a finding of negligence on the part of defendant. The printed instructions made no reference to plug P. It was installed on top of the burner with an electrical driver and could not be removed without a wrench. It was designed and intended to close an opening in each burner left for the purpose of inserting a *mechanical* as opposed to an *electrical* limit control if desired and for oiling those burners equipped with *leather* rather than *synthetic rubber* diaphragms. The burner which exploded here was equipped with an electrical limit control and with a synthetic rubber diaphragm so that plug P served no function in connection with its operation and did not have to be removed.

The burner was not inherently dangerous, and there is no evidence that the design or plan of its construction was defective or would constitute a source of danger to those using it. Even the removal of plug P was not inherently dangerous unless the gas line was turned on at the time. Had the burner been used in the way that it was intended to be used—in the way which defendant might reasonably anticipate it would be used—no danger whatever would have attached thereto either because of plug P or because of the general design or plan of construction.

While there is testimony that the removal of plug P would "bleed" the line of air, the record is replete with evidence that such a method would be extremely dangerous. Its removal had the effect of releasing the gas pressure within the main valve of the diaphragm and permitting the gas to flow into and accumulate in the combustion chamber of the burner. In consequence, when decedent and the others again endeavored to ignite the burner after its removal, the accumulated propane gas and air caused the explosion which followed. Their actions contrary to directions can scarcely be said to establish negligence in the construction or design of the burner.

As to the instructions furnished by defendant, in my opinion they do not appear to be inadequate. They included an installation manual and a separate instruction form which contained specific directions covering "INITIAL START UP," "NORMAL STARTING PROCEDURE," and included a "TROUBLE CHART." Only in the "INITIAL START UP" instructions was any reference made to purging the lines of air. This instruction was plainly designed for the party installing the equipment. Where the installation had been completed, the lines freed of air, and the "initial start up" made, as was the case here, the reference to purging the lines of air obviously had no further application. In particular, it had no application to decedent who, at the most, would be expected to follow only the instructions relative to "NORMAL STARTING PROCEDURE." In the latter, as in the "TROUBLE CHART," there is no reference to purging the lines of air nor to plug P. Even in the "INITIAL START UP" instructions, plug

280

P is not mentioned as an outlet for air in the lines. Had the "Normal Starting Procedure" been followed, there would have been no explosion.

Based upon the foregoing factors, I am of the opinion that the record fails to disclose actionable negligence chargeable to defendant.

Matson, Justice.

I concur in the dissent of Mr. Justice Thomas Gallagher.

Knutson, Justice.

I concur in the dissent of Mr. Justice Thomas Gallagher.

