JAMES M. BECK AND ANOTHER v. HERBERT SPINDLER,
SOLE TRADER d.b.a. HERB SPINDLER COMPANY,
AND ANOTHER.
VENTOURA CORPORATION, APPELLANT.

99 N. W. (2d) 670.

November 20, 1959—No. 37,736.

*Gannon & Dahle,* for appellant.

*Stein & Stein* and *David Naughtin,* for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order of the trial court denying a motion of defendant Ventoura Corporation for judgment notwithstanding the verdict or for a new trial.

Defendant Ventoura Corporation is a manufacturer of house trailers and is located at Elwood, Indiana.

Defendant Herbert Spindler, sole trader, doing business as Herb Spindler Company, referred to hereinafter as Spindler, is a dealer in house trailers of various makes, including Ventoura house trailers, and is located at Duluth, Minnesota.

On October 3, 1956, Spindler sold a new 1957 Ventoura house trailer to plaintiffs on a conditional sales contract. As a downpayment, plaintiffs paid $100 in cash, and they were given a credit of $3,000 on an old trailer which they traded in on the new purchase. The balance of the purchase price of the new trailer was to be paid in 60 monthly payments of $143.09 each. The contract thereafter was sold by Spindler to Michigan National Bank.

The new house trailer was delivered to plaintiffs at Hibbing, Minnesota, on October 10, 1956, where it was to be used by plaintiffs as their home. The construction of the trailer was such that during cold weather water collected in large quantities in the ceiling and walls thereof due to condensation, causing the panels and other parts of the interior of the trailer to warp and water to drip from the ceiling of the trailer. There seems to be no doubt that the insulation and ventilation of the trailer made it unfit for use in a climate such as exists in Hibbing.

Spindler had purchased this trailer from Ventoura. He had an exclusive franchise to sell Ventoura trailers within St. Louis County. When Spindler obtained an order for a Ventoura trailer, he would order it from Ventoura and pay down ten percent of the wholesale price, and the balance of the purchase price would be financed with Michigan National Bank. The trailer then would be delivered to Spindler. In reselling it, Spindler would set the price, although Ventoura had a recommended price list.

When a trailer was delivered to Spindler, it would be accompanied by an "OWNER'S WARRANTY POLICY" prepared by Ventoura. As the trailer was sold, this policy or warranty was forwarded to Ventoura by Spindler and sent by Ventoura direct to the buyer. That was done in this case. Among other things, this warranty policy contains the following provision:

"4. FACTORY SERVICE ADJUSTMENTS: If for any reason defects in materials, construction and/or workmanship in this Ventoura Home should occur within the ninety day Warranty period, owner is entitled to factory service on such items providing written request for such service is received, confirmed and approved by the Service Department of the Ventoura Corporation; and that owner returns mobile home to the Ventoura Corporation in Elwood, Indiana for such service with all charges (including transportation) prepaid.

"5. INSPECTION: During the Warranty Period, owner is invited to have his Ventoura Home inspected by any Authorized Ventoura Dealer."

After it developed that the trailer was unsatisfactory, plaintiffs complained to Spindler. Spindler sent his men out to look at it and to attempt to correct the defects complained of, but they were unsuccessful. Spindler then wrote Ventoura on January 21, 1957, as follows:

"As we discussed via phone I am writing you in regard our recent problems on 10' wide Ventouras, #P48T2-HN00401, and #P48T2-KN00539. The first is at Hibbing, Minnesota and was the first 10' received and sold.

"This particular model has been a source of trouble from the start. First we had great condensation problems, after adjustments the condensation on the windows was eliminated. Next gallons of water came through the back bedroom ceiling up over the Revalvex windows, we Kool-Sealed the roof suspecting it was a leak. We have repeatedly checked the mobile home and found enough heat. Saturday the people called again and once again a great deal of water was coming down the side walls and through the ceiling. The mahogany on the back Revalex is in bad shape plus some of the panels. We have asked the woman to cut down on the use of water in cooking, which she

has done. The washer and dryer are not in use as they were not hooked up. This party has cancer and her doctor has advised her that with water falling on the bed, it is not healthy for her to be in the trailer. They are using a great deal of fuel to keep warm. They have followed our instructions on windows and other means of ventilating. To date no success.

"The other Ventoura, #KNO-0539, has been checked and rechecked. We have made inumerable trips and have paid heating men to check all three places.

"We no longer can cope with these problems and feel that your organization must move in and do so immediately.

"With suits in the offering we cannot afford to give promises of future corrections. All the corrections possible by our organization have been done.

"The future sales of two or three Ventouras on at stake. In one case a party drove to Grand Rapids, Minnesota to see the Ventoura. Mr. Booth, the owner, treated them cordially, but their observations were no good.

"I don't think we can wait a month or more for your men to get to these mobile homes, the weather here will get worse as we go along. The need is immediate!"

On August 26, 1957, Spindler wrote Mrs. Belancic, one of the plaintiffs, as follows:

"We were informed as of this morning that the Ventoura, factory representative was on his way to check your mobile home and that he was going to do everything possible to full fill the factory guarantee. The Ventoura plant was also informed that he may not have all the necessary equipment. The factory will express any thing that is needed. Our suggestion is that all cooperation be extended the factory representative to aid in his work. Remember please that he must at least try to full fill all that the guarantee calls for. Your cooperation greatly appreciated."

As a result of correspondence between Spindler and Ventoura, servicemen from Ventoura called at Hibbing and inspected the trailer and attempted to correct the defects existing therein.

As early as February 1957, Mrs. Belancic told representatives of Ventoura that they should take the trailer back. However, plaintiffs continued to make their monthly payments until November 1957, apparently in the hope that the trailer would be put in a satisfactory condition.

An action was commenced in September 1957 in which plaintiffs sought to recover what they had paid. This action was dismissed as to Ventoura upon its motion on the ground of insufficiency of service of process. The propriety of that dismissal is not involved in this appeal. A new action was commenced in November 1957, service then being made upon the secretary of state under M. S. A. 303.13.

Plaintiffs continued to occupy the trailer until February 1958, when they were evicted by the holder of the conditional sales contract and the trailer repossessed.

Upon a trial of this action the jury returned a verdict in favor of plaintiffs. This appeal is from an order of the trial court denying defendant Ventoura's motion for judgment notwithstanding or for a new trial. Spindler appealed separately.

Ventoura contends: (1) That plaintiffs have failed to obtain jurisdiction over it; (2) that an action for a breach of an implied warranty of fitness will not lie as to it because there was no privity of contract between plaintiffs and Ventoura; (3) that if a right of rescission exists plaintiffs have waived the right by remaining in possession of the trailer too long after discovering the defects; and (4) that the court erred in its instructions to the jury.

■ A determination of whether the courts of this state have jurisdiction over Ventoura requires the answer to two somewhat unrelated propositions: First, was the business conducted by Ventoura in Minnesota of such a nature that it was amenable to suit here at all? Second, if it was, did the service upon it satisfy due process of law?

There can be little doubt that the scope of permissible jurisdiction of a state court over foreign corporations has been expanded considerably since Pennoyer v. Neff, 95 U. S. (5 Otto) 714, 24 L. ed. 565.[1] The impact of International Shoe Co. v. Washington, 326 U. S.

[1]See, Annotation, 2 L. ed. (2d) 1664.

310, 66 S. Ct. 154, 90 L. ed. 95, 161 A. L. R. 1057, upon our prior conception of jurisdictional prerequisites was discussed extensively in Schilling v. Roux Distributing Co. Inc. 240 Minn. 71, 59 N. W. (2d) 907, and we see no need of repeating what we said there.[2] The rule evolved in the International Shoe Co. case was that (326 U. S. 316, 66 S. Ct. 158, 90 L. ed. 102, 161 A. L. R. 1061)—

"* * * due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

It would seem that the trend toward greater liberality in permitting state courts to take jurisdiction in this type of case continues. And well it should. In McGee v. International Life Ins. Co. 355 U. S. 220, 78 S. Ct. 199, 2 L. ed. (2d) 223 (decided December 16, 1957), the court held that the California court could obtain jurisdiction over a Texas insurance company under a state statute providing that foreign corporations were amenable to suit on insurance contracts with residents of that state, even though such corporations could not be served with process within its border.[3] In that case plaintiff was a resident of California and the beneficiary of a life insurance policy which originally had been issued by an Arizona corporation. Defendant, a Texas corporation, had agreed to assume the insurance obligations of the Arizona company and had issued a reinsurance certificate to the insured. From 1948 until his death in 1950 the insured had paid the premiums by mail from his California home to defendant's office in Texas. When the insured died, defendant refused to make payment under the policy on the ground that the insured had committed suicide. Other than the policy in question, neither defendant nor the Arizona corporation had solicited or done any insurance business in California. Plaintiff sued in a California state court under a statute providing a

[2]See, also, State v. Northwestern States Portland Cement Co. 250 Minn. 32, 37, 84 N. W. (2d) 373, 377; Nerlund v. Schiavone, 250 Minn. 160, 163, 84 N. W. (2d) 61, 64.

[3]California Insurance Code 1953, §§ 1610 to 1620.

method of substitute service on nonresident insurance companies. A default judgment was entered, and suit was brought on this judgment in the Texas court. The Texas court refused to give the judgment full faith and credit on the ground that the California court lacked jurisdiction.

On appeal, the United States Supreme Court noted that in a continuing process of evolution it had abandoned the concepts of (355 U. S. 222, 78 S. Ct. 200, 2 L. ed. [2d] 225) "consent," "doing business," and "presence" as proper bases of jurisdiction. It stated that there was a clearly discernible trend toward expanding the permissible scope of state jurisdiction over foreign corporations and other non-residents. After discussing the International Shoe Co. case, the court said (355 U. S. 223, 78 S. Ct. 201, 2 L. ed. [2d] 226):

"* * * It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State. * * * The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims."

In support of this statement the court cited with approval Smyth v. Twin State Improvement Corp. 116 Vt. 569, 80 A. (2d) 664, 25 A. L. R. (2d) 1193, and Compania de Astral, S. A. v. Boston Metals Co. 205 Md. 237, 107 A. (2d) 357, 108 A. (2d) 372, 49 A. L. R. (2d) 646, certiorari denied, 348 U. S. 943, 75 S. Ct. 365, 99 L. ed. 738.

Following the McGee case by only a few months came Hanson v. Denckla, 357 U. S. 235, 78 S. Ct. 1228, 2 L. ed. (2d) 1283 (decided June 23, 1958), in which the Supreme Court of the United States held that the Florida courts did not have jurisdiction over a Delaware trustee in an action involving a trust since the trust situs was not in Florida. In doing so, the court cautioned that, in spite of the McGee case, all restraints had not been removed. The court said (357 U. S. 250, 78 S. Ct. 1238, 2 L. ed. [2d] 1296):

"* * * Principal reliance is placed upon McGee v. International Life Ins. Co., 355 U. S. 220. In McGee the Court noted the trend of

552

expanding personal jurisdiction over nonresidents. As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of Pennoyer v. Neff, 95 U. S. 714, to the flexible standard of International Shoe Co. v. Washington, 326 U. S. 310. But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. See Vanderbilt v. Vanderbilt, 354 U. S. 416, 418. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him."

With respect to the application of the rule of International Shoe Co. v. Washington, *supra*, the court said (357 U. S. 253, 78 S. Ct. 1240, 2 L. ed. [2d] 1298):

"* * * The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

The court failed to find those contacts in Hanson v. Denckla, *supra.*[4]

■ From these decisions it would seem that determination of the applicable rule presents no serious difficulty. Application of the rule to given facts, however, often does. Whether the minimal contacts required exist in a particular case should depend on the quality and nature of the transaction rather than on the quantity of business done by the foreign corporation. It should depend upon the importance and

---

[4]See, L. D. Reeder Contractors of Arizona v. Higgins Industries, Inc. (9 Cir.) 265 F. (2d) 768.

nature of the business which gives birth to the litigation. It seems only fair to permit one who has suffered a wrong at the hands of a resident of a foreign state to sue in his own state irrespective of whether he can show multiple transactions or not. Such would seem to be the result reached in McGee v. International Life Ins. Co. *supra.*

■ Applying these rules to the present case, the facts here show that Ventoura granted Spindler an exclusive franchise to sell its trailers in St. Louis County; it joined with Spindler in filing documents with the secretary of state of Minnesota in order that Spindler might obtain a dealer's license under M. S. A. c. 168 and thereby be relieved of the obligation to pay a license fee on the trailers prior to sale; it reimbursed Spindler, to the extent of one-half, for advertisements in Duluth papers advertising Ventoura trailers; the conditional sales contracts used by Spindler were drafted in Indiana by Ventoura; it sent direct to the purchaser a warranty policy under which it agreed to make good any defects in the trailer appearing within a period of 90 days, and, when complaints were received concerning defects in the trailer, it sent its servicemen to Hibbing in an effort to repair such defects; and it carried on correspondence with Spindler concerning the unsuitability of the trailer involved in this litigation and other trailers which apparently had been sold by Spindler.

It would seem from the decisions that the contacts with Minnesota were amply sufficient to satisfy the rule permitting suit to be brought against the company in Minnesota.

■ While the constitutionality of M. S. A. 303.13 has not been seriously challenged, the question arises whether service upon the secretary of state under this statutory provision satisfied due process. Section 303.13, subd. 1, as far as here material, reads:

"A foreign corporation shall be subject to service of process, as follows:

\* \* \* \* \*

"(3) If a foreign corporation makes a contract with a resident of Minnesota to be performed in whole or in part by either party in Minnesota, or if such foreign corporation commits a tort in whole or in part in Minnesota against a resident of Minnesota, such acts shall be

deemed to be doing business in Minnesota by the foreign corporation and shall be deemed equivalent to the appointment by the foreign corporation of the secretary of the State of Minnesota and his successors to be its true and lawful attorney upon whom may be served all lawful process in any actions or proceedings against the foreign corporation arising from or growing out of such contract or tort. Such process shall be served in duplicate upon the secretary of state, together with a fee of $6 and the secretary of state shall mail one copy thereof to the corporation at its last known address, and the corporation shall have 20 days within which to answer from the date of such mailing, notwithstanding any other provision of the law. The making of the contract or the committing of the tort shall be deemed to be the agreement of the foreign corporation that any process against it which is so served upon the secretary of state shall be of the same legal force and effect as if served personally within the State of Minnesota."

The question naturally arises whether the act, making amenable to suit a foreign corporation involved in a single contract to be performed in whole or in part in Minnesota or a tort committed in Minnesota in whole or in part, can be upheld on constitutional grounds. A Vermont statute very similar to ours was considered by the Vermont court in Smyth v. Twin State Improvement Corp. 116 Vt. 569, 80 A. (2d) 664, 25 A. L. R. (2d) 1193,[5] and upheld on constitutional grounds in a case involving the commission of a tort. In Compania de Astral, S. A. v. Boston Metals Co. 205 Md. 237, 107 A. (2d) 357, 108 A. (2d) 372, 49 A. L. R. (2d) 646, certiorari denied, 348 U. S. 943, 75 S. Ct. 365, 99 L. ed. 738, the Maryland court upheld a statute[6] somewhat similar in a contract action. With respect to the amenability

---

[5]See, Annotation, 25 A. L. R. (2d) 1202; see, also, 100 U. of Pa. L. Rev. 598; 42 Minn. L. Rev. 909, 915.

[6]Maryland Ann. Code 1951, art. 23, § 88(d), provides:

"Every foreign corporation shall be subject to suit in this State by a resident of this State or by a person having a usual place of business in this State on any cause of action arising out of a contract made within this State * * * whether or not such foreign corporation is doing or has done business in this State."

to suit of a foreign corporation engaged in a single transaction, the Maryland court said (205 Md. 258, 107 A. [2d] 366):

"The non-resident motorist cases[7] have shattered any argument to the effect that a single transaction by a non-resident may not be made the basis for amenability to suit in the state where the transaction occurred. The Doherty & Co. case[8] has rendered untenable any contention that a contract made within a state cannot serve as the basis for suit in that state against a non-resident party to the contract."

For a discussion of the Minnesota statute and cases involving this proposition generally, see Note, 42 Minn. L. Rev. 909.

It would seem that McGee v. International Life Ins. Co. *supra,* adds further support to these decisions, although it might be argued that the McGee case involved an insurance contract and that special consideration is given to such contracts.[9] However, we believe that this should be no constitutional barrier to a holding that a foreign corporation which engages in a single contract within this state should be amenable to suit for damages arising out of that contract irrespective of whether it engages in additional contracts or not.

■ We come then to the question whether service under § 303.13 was sufficient to satisfy due process. We think that it was. While McGee v. International Life Ins. Co. *supra,* involved a suit on an insurance contract, the service permitted under the California statute[10] was similar to that provided in our § 303.13 except that registered mail was required. As far as due process is concerned, there can be no difference between insurance contracts and other contracts. Similar service has been upheld in tort actions involving use of an automobile on the highways of the state. The only difference between our statute and

---

[7]See, Hess v. Pawloski, 274 U. S. 352, 47 S. Ct. 632, 71 L. ed. 1091; Wuchter v. Pizzutti, 276 U. S. 13, 48 S. Ct. 259, 72 L. ed. 446, 57 A. L. R. 1230; see, also, Young v. Masci, 289 U. S. 253, 53 S. Ct. 599, 77 L. ed. 1158, 88 A. L. R. 170.

[8]Doherty & Co. v. Goodman, 294 U. S. 623, 55 S. Ct. 553, 79 L. ed. 1097.

[9]See, 39 Va. L. Rev. 966; 42 Minn. L. Rev. 909, 921.

[10]California Insurance Code 1953, §§ 1610 to 1620.

the Vermont statute involved in Smyth v. Twin State Improvement Corp. *supra,* is that under the Vermont statute, like the California Insurance Code, service must be made by registered mail, while under our statute ordinary mail by the secretary of state was all that was required.

In Wuchter v. Pizzutti, 276 U. S. 13, 19, 48 S. Ct. 259, 260, 72 L. ed. 446, 449, 57 A. L. R. 1230, 1234, in holding a New Jersey statute unconstitutional for lack of a requirement that process be communicated to defendant, the court said:

"* * * the service of process on a state officer by the defendant would not be fair or due process unless such officer or the plaintiff is required to mail the notice to the defendant, or to advise him, by some written communication, so as to make it reasonably probable that he will receive actual notice. * * *

"* * * Every statute of this kind, therefore, should require the plaintiff bringing the suit to show in the summons to be served the post office address or residence of the defendant being sued, and should impose either on the plaintiff himself or upon the official receiving service or some other, the duty of communication by mail or otherwise with the defendant."

We think that the service under our statute satisfies due process.

Ventoura contends that § 303.13, subd. 1(3), which became effective on April 20, 1957, cannot be given retroactive effect. The contract for the sale of the trailer involved here was executed on October 3, 1956, and it is the contention that, inasmuch as the contract was executed prior to the effective date of § 303.13, that statute would have to be given retroactive effect if it is applicable here. Section 645.21 reads as follows:

"No law shall be construed to be retroactive unless clearly and manifestly so intended by the legisature."

In Chapman v. Davis, 233 Minn. 62, 45 N. W. (2d) 822, and Ekstrom v. Harmon, 256 Minn. 166, 98 N. W. (2d) 241, we held that § 645.21 applies equally to procedural laws and substantive rights. In Ekstrom v. Harmon, we said (256 Minn. 168, 98 N. W. [2d] 242):

"If the legislature wishes to give retroactive operation to one of its statutes, *so as to effect causes of action which arise before its enactment,* even as to statutes relating to or governing procedure, it may easily make such an intention clearly manifest." (Italics supplied.)

Here, the cause of action accrued when there was a failure on the part of defendants to perform the contract.[11] The evidence shows that efforts were made to correct the defects existing in the trailer for a long time after the effective date of § 303.13. The cause of action did not accrue prior to the enactment of the statute. It accrued only when it became apparent that the defects would not be corrected. Section 303.13 did nothing more than provide a method for obtaining service upon a foreign corporation in a cause of action to accrue in the future. Under these circumstances, it cannot be said to have been given retroactive effect here. We think that the act was applicable to this cause of action.

■ We come then to the troublesome question of whether plaintiffs, under the facts of this case, may recover for a breach of implied warranty of fitness against the manufacturer, Ventoura, or if they are limited to a recovery against the dealer, Spindler. In other words, the question is whether a subvendee may recover against the manufacturer of a chattel, the purchase having been made from an intermediate dealer.

It is the contention of Ventoura that plaintiffs cannot recover because there was no privity of contract between plaintiffs and Ventoura. The pertinent portion of our Sales Act (M. S. A. 512.15) reads as follows:

"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

---

[11] 1 Am. Jur., Actions, § 62.

558

An implied warranty is imposed by law for the protection of the buyer and does not depend upon the affirmative intention of the parties. In Bekkevold v. Potts, 173 Minn. 87, 89, 216 N. W. 790, 791, 59 A. L. R. 1164, 1166, we said:[12]

"An implied warranty is not one of the contractual elements of an agreement. It is not one of the essential elements to be stated in the contract nor does its application or effective existence rest or depend upon the affirmative intention of the parties. It is a child of the law. Because of the acts of the parties, it is imposed by the law. It arises independently and outside of the contract. The law annexes it to the contract. It writes it, by implication, into the contract which the parties have made. Its origin and use are to promote high standards in business and to discourage sharp dealings. It rests upon the principle that 'honesty is the best policy,' and it contemplates business transactions in which both parties may profit. * * * The doctrine of implied warranty should be extended rather than restricted."

■ The doctrine of implied warranty is favored by this court, and such warranties should be given effect when it is possible to do so.[13]

In Iron Fireman Coal Stoker Co. v. Brown, 182 Minn. 399, 403, 234 N. W. 685, 687, we said:

"The doctrine of implied warranty is to be liberally construed. * * * The rule is an equitable one."

■ Much has been written on the subject of implied warranties and the necessity of privity of contract to permit recovery against a manufacturer when a sale is made through an intermediate dealer.[14]

---

[12]See, also, McPeak v. Boker, 236 Minn. 420, 53 N. W. (2d) 130.

[13]See, Federal Motor Truck Sales Corp. v. Shanus, 190 Minn. 5, 250 N. W. 713.

[14]For those who wish to pursue the matter further, see 33 Col. L. Rev. 868; 18 Cornell L. Q. 445; 42 Harv. L. Rev. 414; 2 Vanderbilt L. Rev. 675; 57 Yale L. J. 1389; 23 Calif. L. Rev. 621; 21 Minn. L. Rev. 315; 1951 Insurance L. J. 797; 2 Mo. L. Rev. 73; 22 Wash. U. L. Q. 406; 37 Col. L. Rev. 77; 22 Rocky Mountain L. Rev. 176; 5 Vanderbilt L. Rev. 849; Annotations, 17 A. L. R. 709, 39 A. L. R. 1000, 63 A. L. R. 349, 88 A. L. R. 534.

It would be a hopeless task to review, in this opinion, what has been written on the subject or to try to evolve therefrom any rational rule which would apply to this case. Probably the best analysis of the problem is to be found in Prosser, Torts (2 ed.) § 84, p. 506, where, among other things, the author said:

"With the liability of the manufacturer to the ultimate consumer once established on the basis of negligence, it was to be expected that some attempt would be made to carry his responsibility even further, and to find some ground for strict liability which would make him in effect a guarantor of his product, even though he had exercised all reasonable care. In recent years a considerable impetus has been given to this attempt, which has met with the approval of every legal writer who has discussed it, by an increased feeling that social policy demands that the burden of accidental injuries caused by defective chattels be placed upon the producer, since he is best able to distribute the risk to the general public by means of prices and insurance. * * *

"The device most ready at hand to accomplish this result was an extension of the strict liability of implied warranty beyond the immediate buyer, to the ultimate consumer. In the way of such an extension has stood the common acceptance of the idea of a warranty as something necessarily a part of a contract. Where there is no contract between a seller of goods and the person who consumes them, the majority of the courts have refused, and continue to refuse, to find any warranty from the one to the other. * * * *The preoccupation with contract in connection with warranty has no sound foundation.* The action for breach of warranty was originally a tort action, for breach of a duty assumed, and it is by no means clear that it was anything more than the accident that the cases which arose involved contracts which led to its being regarded as a matter of contract at all. The original tort theory is still very much alive, and a return to it is still possible whenever the courts choose to find that the manufacturer has assumed a duty toward those who use his product." (Italics supplied.)

In this state we long ago held that one who negligently manufactures a chattel is liable to a person injured by the use of it, even though there is no privity of contract between them. Schubert v. J. R. Clark Co.

49 Minn. 331, 51 N. W. 1103, 15 L. R. A. 818. That rule has been followed consistently in subsequent cases. Heise v. J. R. Clark Co. 245 Minn. 179, 71 N. W. (2d) 818; Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804; Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688; Hofstedt v. International Harvester Co. 256 Minn. 453, 98 N. W. (2d) 808.

The rule that recovery may be had against the manufacturer on the theory of negligence, without any privity of contract, was given considerable impetus in MacPherson v. Buick Motor Co. 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696, and since that time there has been a growing tendency to permit recovery against the manufacturer by a subvendee, even though there was no privity of contract, if the action is based on negligence.[15]

Originally, an action for breach of warranty was a tort action.[16]

Historically, it probably was unfortunate that the implied obligation assumed by the seller or manufacturer was ever referred to as a warranty. It could as well have been referred to as an implied representation of fitness for the use for which it was made or sold, in which event the action could have continued as a tort action in the nature of one for deceit. It is difficult to justify a rule of law which permits recovery against the manufacturer on the theory of negligence and does not permit it on the theory that the manufacturer has represented that the product he puts out is fit for the use for which it is sold, no matter by what name that representation is denominated, where both obligations arise, not from the agreement of the parties, but by an obligation imposed by law. This difficulty is recognized in 1 Williston, Sales (Rev. ed.) § 237, p. 619, where the author said:

"Logically it seems difficult to find any intermediate ground between basing the seller's liability either wholly on negligence or on an obligation imposed by the law entirely irrespective of negligence—an obligation analogous to that created by an express warranty. If a manufacturer is not liable for the use of defective material, in the absence of

---

[15]See, Annotation, 164 A. L. R. 569.

[16]See, Prosser, Torts (2 ed.) § 83, p. 493; Prosser, *The Implied Warranty of Merchantable Quality*, 27 Minn. L. Rev. 117.

negligence it is hard to see why any seller should be liable for selling unmerchantable goods in the absence of negligence."

It would seem that, if privity is to constitute an essential element of recovery, to be consistent it should be required whether the action is based on negligence or breach of the so-called implied warranty.

It may well be that the time has come when we should discard the whole troublesome idea that privity of contract is essential to recovery on an implied warranty and extend liability to the one who has caused the harm. If that were done, clearly the manufacturer of a chattel would become liable because in many, if not most, of the cases it is the manufacturer rather than the dealer who ought to know whether the chattel is fit for the use for which it is to be sold. In the case before us, for instance, the dealer had no way of knowing what type of insulation lay beneath the panels on the walls and ceiling without dismantling the trailer before it was sold. The manufacturer, on the other hand, knowing the locality and the climate thereof in which the trailer was to be offered for sale, should be held to a duty of knowing what type of insulation and ventilation would be suitable for that climate. Under those circumstances, it is difficult to see why an injured party should be permitted to recover against the manufacturer on the theory that he negligently used improper material in the construction of the trailer and not be permitted recovery on the theory that the manufacturer had breached an implied warranty that the trailer was fit for use in the locality in which it was sold.

In B. F. Goodrich Co. v. Hammond (10 Cir.) 269 F. (2d) 501, an action was brought against B. F. Goodrich Company for the wrongful death of a passenger in a car who was killed as a result of the blowout of a tubeless tire. The defense was that there was no privity of contract. The case was decided under Kansas law. The court said (269 F. [2d] 504):

"Under the law of Kansas an implied warranty is not contractual. It is an obligation raised by the law as an inference from the acts of the parties or the circumstances of the transaction and it is created by operation of law and does not arise from any agreement in fact of the parties. The Kansas decisions are in accord with the general rule laid

down in the adjudicated cases. And under the Kansas decisions privity is not essential where an implied warranty is imposed by the law on the basis of public policy."

A few courts have now discarded the theory of privity.[17] It would seem that some other courts have tried to find a way of permitting recovery without expressly discarding the idea of privity.[18]

■ But whatever the law is or should be with respect to the right of a party to recover of the manufacturer for breach of an implied warranty in the absence of privity, it would seem that recovery should be permitted in this case. Under the facts here, Ventoura was no stranger to the contract. As an integral part of the sales contract, Ventoura entered into an express agreement with the purchaser under its warranty policy. In addition to the portion thereof quoted above, we find the following:

"Your Ventoura Home has been prepared and delivered in accordance with standard Ventoura Factory Instructions and *to validate this warranty your signature must be affixed to the Inspection & Delivery Certificate and Registration Certificate covering this Ventoura Home and be returned to the factory by your dealer.*" (Italics supplied.)

Thereafter, as has been stated above, Ventoura warranted the quality of the material and workmanship in the trailer and agreed to service the same at its factory. When it was found that the trailer was unsuitable for use in the climate for which it was sold, Ventoura sent its own employees to Hibbing in an effort to correct the defects existing in it. Being unsuccessful, it now seeks to escape liability on the claim that it was not a party to this sale and that no privity of contract existed between it and plaintiffs. We think that the trial court correctly held that Ventoura assumed contractual obligations to the purchaser and, having done so, was a seller within the meaning of our Sales Act. The implied warranty of fitness imposed by law, under the liberal

---

[17]See, Continental Copper & Steel Industries, Inc. v. E. C. "Red" Cornelius, Inc. (Fla. App.) 104 So. (2d) 40; Spence v. Three Rivers Builders & Masonry Supply, Inc. 353 Mich. 120, 90 N. W. (2d) 873.

[18]See, Baxter v. Ford Motor Co. 168 Wash. 456, 12 P. (2d) 409, 15 P. (2d) 1118, 88 A. L. R. 521.

interpretation accorded such warranties by our decision law, should be held to attach to all contractual obligations arising out of the sales contract. We therefore hold that, irrespective of whether privity of contract is essential to a recovery by a subpurchaser against the manufacturer of a chattel, the essential elements are present in the case now before us.

Ventoura relies heavily on Torpey v. Red Owl Stores, Inc. (D. Minn.) 129 F. Supp. 404. The facts in that case are distinguishable from those now before us. In the Torpey case plaintiff was injured while pressing the cover back on a partly used jar of applesauce sold by defendant to plaintiff's sister. The complaint alleged both negligence and breach of implied warranty. The jury found for defendant on the issue of negligence. The case presents a variation of the question involved in application of the rule denying recovery where no privity of contract exists. In the Torpey case the question is this: When A sells a chattel to B impliedly warranting it to be fit for the purpose for which it is sold, may C, who uses the chattel, recover against A for breach of such warranty? The Torpey case held that he may not. In the case before us the question is somewhat different. Here, it is this: When A manufactures a chattel which is sold by dealer B to C, may C recover of A for breach of an implied warranty of fitness? While the lack of privity may be as important in one case as in the other, there is less difficulty in finding such privity or at least a direct connection between A and C in the latter case than there is in the former. As has been noted by Prosser, Torts (2 ed.) § 84, p. 507, "the intermediate dealer is usually a mere conduit to market the product." There is good reason for holding the manufacturer in such case to be the one who warrants the chattel to the ultimate purchaser and to be within the definition of a seller under our Uniform Sales Act. We need not determine whether one who is not connected with the sale at all, such as was true in the Torpey case, can recover against the one who sells the chattel. That is not the case we are dealing with here.

■ Ventoura then contends that if there was a breach of implied warranty plaintiffs have waived it by remaining in possession of the trailer too long after discovering the breach.

564

Waiver is a voluntary relinquishment of a known right. Whether there has been a waiver ordinarily is a question of fact for the jury.[19] Each case must rest on its own facts.

■ Here, defendants attempted to repair the defect for a long time after being first advised of the unsuitability of the trailer. While they were so engaged, the reasonable time within which the buyer could rescind did not run.[20] Ventoura's employees called on plaintiffs as late as July 1957. The action was commenced in September. Ventoura obtained a dismissal of that action as to it. At least from September it must be held that they denied plaintiffs' right to rescind. It is apparent from the record that plaintiffs are not well-educated people. The jury could justifiably take that into consideration in determining whether they exercised their right of rescission within a reasonable time. Under all the circumstances, the question of waiver was properly submitted to the jury, and it has found against defendants on this issue.

■ Ventoura next contends that rescission lies only between the parties to the sale. Inasmuch as we hold that Ventoura was a party to this sale, we see no need of further discussing this contention. The action is based on a breach of an implied warranty. Rescission is only incidental to a right of recovery for breach of an implied warranty. If Ventoura is liable for a breach of its warranties, it should be sufficient if the right of rescission exists between plaintiffs and Spindler. Rescission only gives rise to the right of recovery. Plaintiffs could hardly return the property to both defendants. As a matter of fact, Ventoura has been paid for the trailer by Spindler and needs no return of the property in order to be made whole.

We express no opinion as to whether there was a disclaimer of an implied warranty under Ventoura's warranty policy.[21] Disclaimer was

---

[19]Engstrom v. Farmers & Bankers Life Ins. Co. 230 Minn. 308, 41 N. W. (2d) 422.

[20]Federal Motor Truck Sales Corp. v. Shanus, 190 Minn. 5, 250 N. W. 713; Heibel v. United States Air Conditioning Corp. 206 Minn. 288, 288 N. W. 393.

[21]See, M. S. A. 512.71; Bekkevold v. Potts, 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164; 27 Minn. L. Rev. 157; Vold, Sales, § 150; 1 Williston, Sales (Rev. ed.) § 239.

not interposed as a defense; the case was not tried on that theory; it was not made part of a motion for a new trial; it is not assigned as error here; nor is it briefed or argued except as to a single statement in the brief of Ventoura.

Affirmed.