JOAN JESSEN, BY GEORGE JESSEN, FATHER AND
NATURAL GUARDIAN, v. SCHUNEMAN'S, INC.
GEORGE JESSEN v. SAME.[1]

December 16, 1955.

Nos. 36,218, 36,219.

*Silver, Goff, Murphy, Ryan & Dillon* and *Ira Karon,* for appellants.
*Linus J. Hammond* and *Cummins, Cummins, Hammond & Ames,*
for respondent.

KNUTSON, JUSTICE.

Appeals from judgments entered pursuant to orders of the court
granting judgment notwithstanding the verdicts in favor of both
plaintiffs after trial of the cases to a jury.

---

[1]Reported in 73 N. W. (2d) 786.

In May or June 1948, defendant, Schuneman's, Inc., which operates a large department store in the city of St. Paul, purchased approximately 400 Jane Dunbar coffeemakers from John Leslie Paper Company at a good price for the reason that the Leslie company was discontinuing the sale of this line. On June 30, 1948, the St. Paul Dispatch carried an advertisement for Schuneman's, Inc., offering 300 of these coffeemakers for one dollar each. The advertisement read substantially as follows:

"for Thursday only!

" 'JANE DUNBAR' VACUUM

"COFFEE MAKER

"Enjoy delicious full-flavored coffee as you like it—no sediment, no metallic taste, no waste! 8-cup capacity, heat-proof glass, makes attractive coffee service right on the table! Complete, ready to use! While 300 last!

"1.00

"HOUSEWARES, DOWNSTAIRS"

Cecilia Jessen, wife of plaintiff George Jessen, had dealt with Schuneman's, Inc., for many years. Seeing the ad, she went to the store and purchased one of the coffeemakers. She testified that the saleslady who sold it to her said that Schuneman's guaranteed the coffeemaker. This was denied by the saleslady, who claimed that they never guaranteed anything except that they would make good any defective coffeemaker by replacing it. The coffeemaker was delivered to Mrs. Jessen by Schuneman's the next day. She removed it from the box, examined it and found no defects or cracks, washed it, and put it away in a cupboard. About four or five days later she used it for the first time and had no difficulty with it. It operated the same as a Cory maker which she had formerly used. After using it on this occasion she washed it and put it back into the cupboard. She then saw no defect in it. Several days later she used it again and had no difficulty with it.

The third time that Mrs. Jessen used the coffeemaker was on July 16, 1948. On that date, at about 5:30 p. m., she and her husband

and their two children were having dinner when company arrived, consisting of a neighbor, Mrs. Mavis Hammerstrom, and her three children of the ages of one year, six years, and nine years. In order to make room for them at the table, the Jessens shifted around. Joan Jessen, of the age of 13 months, who had been sitting in the high chair, was removed and was permitted to walk around the kitchen in order that the Hammerstrom baby could occupy the high chair. Joan was less than two feet in height.

In order to make more coffee for the newly arrived guests, Mrs. Jessen took the Dunbar coffeemaker from the cupboard, filled it with the usual amount of water and coffee, and placed it on the stove. The stove was a gas range, 35 inches high and 20 inches wide, with four burners. The coffeemaker was placed on one of the front burners of the stove.

Mrs. Jessen sat at the table about five feet from the stove, and Mr. Jessen sat where he could observe the stove. About eight or ten minutes after she had placed the coffeemaker on the stove, Mrs. Jessen heard Joan scream, and she jumped up from the table and found Joan covered with coffee grounds and hot water. It is not denied that she was seriously burned. She was about two feet from the stove when she was first observed. The top part of the coffeemaker was on the floor a couple of feet from Joan. The bottom half was still on the stove, and it had about half an inch of water in it, the normal amount remaining after the water had gone to the top part of the maker. No part of the coffeemaker was cracked or broken, and no one heard any explosion or other noise before Joan's scream was heard.

About three or four weeks after the occurrence related above, plaintiffs retained an attorney. The coffeemaker then was taken to Twin City Testing Laboratory intact and unbroken. Plaintiffs contend that the upper portion was then broken by a chemist, apparently before any test could be made. At the trial no one from the laboratory was called, and we can only surmise that the laboratory found nothing wrong with the coffeemaker. Defendant called two expert witnesses, an instructor and a professor at the University of Minnesota, College of Engineering, who testified that in their

opinion, under the evidence in this case, it would be impossible for the coffeemaker to generate enough pressure in the lower portion of it, after the water had gone to the top part, to blow the top part off from the bottom of the apparatus.

The actions were commenced and tried on the theory of a breach of an implied warranty of fitness for the purpose for which the coffeemaker was sold. The jury returned verdicts in favor of both plaintiffs, and thereafter the trial court granted defendant's motion for judgment notwithstanding the verdict on the ground that the evidence was insufficient to warrant an inference that the article was not reasonably fit for the use for which it was intended.

■ In an action based on a breach of warranty, the burden rests on plaintiff of proving the warranty and the breach of it.[2]

■ The Dunbar coffeemaker is of the usual type commonly used for making coffee. Similar coffeemakers are sold under a number of trade names. They consist essentially of two bowls. The upper bowl extends into a funnel or tube which may be fitted into the lower bowl. A rubber gasket or band seals the connection between the two bowls. The coffeemaker is operated by filling the lower bowl with water to a specified height. The upper bowl is then fitted into the lower bowl so that the tube or funnel extends down into the water. A filter is placed in the top bowl, and, as the water in the lower bowl approaches the boiling point, the expansion of steam and water in the lower bowl causes the water to rise through the tube and into the upper bowl, where it comes into contact with the coffee. The heat is then reduced or the coffeemaker is removed from the heat, and as the water cools it filters through the coffee down into the lower bowl, and the coffee is then ready for use. The top portion is then removed from the lower portion.

In granting defendant's motion, the trial court said in its memorandum:

"The verdict can be sustained only upon the theory that proof of an occurrence of an accident in connection with the use of the article sold by the defendant, the cause of which is totally unexplained, is

<hr>

[2]Kavli v. Leifman, 207 Minn. 549, 292 N. W. 210.

sufficient to warrant the jury in drawing an inference that the article was not reasonably fit for the purpose for which it was intended."

Of course, that is true. Essentially, plaintiffs seek to invoke the doctrine of res ipsa loquitur. Even if that rule could be applied to actions for breach of warranty,[3] it would not apply here for the reason that, at the time the accident occurred, the coffeemaker was not in control of defendant.[4]

Plaintiffs' contention, as set forth in their brief, is:

"Having in mind that the warranties made by defendant include the representation that the 'goods are reasonably fit for ordinary uses to which goods of that kind are put' and having in mind that it is admitted that the coffee maker in the instant case was so warranted, the question remains as to whether the evidence establishes that the coffee maker did not comply with such warranty.

"This question does not require a showing that the defendant was in any way negligent and therefore does not require that the reason for the failure of the warranted article be shown. Why the coffee maker was not suitable for its use—that is, why the coffee maker did not work properly, need not be shown. Only that it did not work properly and was not suitable for its ordinary use of making coffee is material, and only this must be established by plaintiff. If it is unsuitable, the reason why it is unsuitable and whether anyone was negligent is [sic] creating an unsuitable coffee maker are wholly immaterial."

There are at least two difficulties with plaintiffs' position. The first, and probably fatal, difficulty is that there is no proof that the coffeemaker was unsuitable for its use. The evidence is completely devoid of anything from which an inference of nonfitness can be drawn. The evidence entirely fails to establish that there was any defect in the coffeemaker, either in its design or manufacture. It fails to show how the top part fell from the bottom part. Further-

[3]See, 77 C. J. S., Sales, § 365, p. 1287; Poovey v. International Sugar Feed Co. 191 N. C. 722, 133 S. E. 12; Oregon Auto-Dispatch v. Portland Cordage Co. 51 Ore. 583, 94 P. 36, 95 P. 498.

[4]See, Brooks v. Hill-Shaw Co. (7 Cir.) 117 F. (2d) 682.

more, the evidence is conclusive that the coffeemaker did work properly up to the point where the water had left the bottom bowl and had gone into the top bowl. The testimony of defendant's experts is that, from that point, it would be impossible to generate enough pressure in the bottom bowl to blow off the top part.

It may have been unfortunate that the coffeemaker was broken. However, that fact cannot be attributed to defendant. From that time on it was impossible for either plaintiffs or defendant to test this particular coffeemaker, and, necessarily, the opinion of the experts thereafter was based on abstract laws of physics.

Plaintiffs rely on our cases of Pietrus v. J. R. Watkins Co. 229 Minn. 179, 38 N. W. (2d) 799, and Schilling v. Roux Distributing Co. Inc. 240 Minn. 71, 59 N. W. (2d) 907. There is an obvious difference between these cases and the one now before us. Both involved actions based on harmful results from the use of a chemical substance sold for use and application to the human skin. In those cases the inference is permissible that the substance used contained harmful ingredients, because a harmful result followed their use. Here, there is nothing from which an inference can be drawn that the article involved was not fit for the purpose for which it was intended.

Nor do we believe that McCabe v. Liggett Drug Co. Inc. 330 Mass. 177, 112 N. E. (2d) 254, and cases of a similar nature are authority for the proposition now advanced by plaintiffs. In the McCabe case the evidence established that there was a defect in design of a metal coffeemaker. The evidence also established conclusively that the metal coffeemaker blew up while plaintiff was using it and while she stood and watched it. The court there said (330 Mass. 181, 112 N. E. [2d] 257):

"The fact that the apparatus violently burst apart in the manner described showed that the accumulating pressure was not being released and in the absence of explanation was itself evidence of a defective condition. * * * The jury could find that the explosion was caused by the failure of the water to rise into the upper bowl and from an examination of the notches in the filter that this failure

was due to an inadequate outlet and the clogging effect of coffee grounds which would collect around the notches.

"If the coffee maker was so imperfect in design that it could not be used without the likelihood of an explosion it could be found that the appliance was not reasonably fit for making coffee and therefore not merchantable."

In the case now before us the evidence shows that the water had all risen to the top part of the coffeemaker. The evidence of defendant's experts is that thereafter the amount of water remaining in the lower bowl could not generate enough steam pressure so as to blow the top part off the bottom bowl. There is no evidence that the coffeemaker was imperfect in design or that it could clog the filter so as to prevent the water from rising from the bottom bowl to the top. Neither is there any evidence of any explosion, as was the situation in the McCabe case. How the top portion of the coffeemaker came to fall off the bottom part is left entirely in the field of conjecture.

The other cases cited by plaintiffs likewise are clearly distinguishable. We would serve no useful purpose in unnecessarily lengthening this opinion by attempting to distinguish them.

In view of our decision on the main issue we need not determine the other questions raised by the appeal.

We are satisfied that the trial court clearly was correct in holding that the evidence in this case falls far short of that necessary to establish breach of an implied warranty.

Affirmed.

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.