ANDREA MARIE McCORMACK, BY DONALD McCORMACK, HER FATHER AND NATURAL GUARDIAN, v. HANKSCRAFT COMPANY, INC.

154 N. W. (2d) 488.

November 17, 1967—No. 39,627.

*Robins, Davis & Lyons, S. Robins, M. Arnold Lyons,* and *John F. Eisberg,* for appellant.

*Murnane, Murnane, Battis & deLambert* and *E. W. Murnane,* for respondent.

ROGOSHESKE, JUSTICE.

Plaintiff appeals from the judgment entered upon an order of the district court granting judgment n. o. v. and a conditional new trial in favor of defendant, Hankscraft Company, Inc.

Plaintiff, Andrea McCormack, brought this action for damages by Donald McCormack, her father and natural guardian, alleging that defendant's negligence and breach of implied and express warranties in the manufacture and sale of a steam vaporizer caused her to suffer substantial personal injuries. During the 3-week trial, defendant's motions for a directed verdict following the submission of plaintiff's evidence and at the close of all the evidence were denied. The court submitted the case to the jury on the questions of negligence and breach of express warranties, refusing to instruct on implied warranties. The jury returned a verdict against defendant, awarding plaintiff $150,000 damages.

Defendant's motion for judgment n. o. v. and in the alternative for a new trial was granted. The motion alleged multiple grounds, including that the verdict was "not justified by the evidence," was "contrary to law," and that there were "excessive damages," but the court in its order merely declared that the motion "is in all things granted" without expressly specifying the grounds upon which the relief was granted.

Understandably, the briefs comprehensively attack or seek to justify the court's order; but, as the parties apparently agree and as we view it, the primary issue is whether the evidence is sufficient to sustain the

jury's verdict of liability upon a theory either of negligence or breach of express warranty.

Viewing, as we must, the evidence and all permissible inferences most favorably to the sustaining of the verdict, the jury reasonably could have found the following facts.

In October 1957, Andrea's father, Donald McCormack, purchased from a retail drugstore an electric Hankscraft steam vaporizer manufactured by defendant. It was purchased pursuant to the advice of a doctor to be used as a humidifier for Andrea, then 8 months old, who had just returned from being hospitalized for croup and pneumonia. After unpacking the vaporizer, Andrea's parents read the instruction booklet accompanying the unit from "cover to cover." Then, following defendant's printed instructions, they put the vaporizer to use in the treatment of Andrea. Thereafter, from time to time as the need arose, it was used for the young children of the family in the prescribed manner, including the use of it unattended throughout the night, without any problem.

The vaporizer was used exclusively in the treatment of the children of the family. After its initial use, Andrea's mother invariably took charge of filling it, setting it up, plugging in the electric cord, replenishing the water in the glass jar, and occasionally, as directed by the booklet, cleaning the heating unit. In using the vaporizer, she relied upon defendant's printed representations that the unit, except for cleaning, needed no attention, could be left unattended in a child's room, would "run all night on one filling of water," and was "safe" and "practically foolproof."

In the spring of 1960, the children had colds and Mrs. McCormack desired to use the vaporizer but found it "wasn't working." She went to the same self-service drugstore and purchased another Hankscraft vaporizer similar to the first unit. She personally selected it without the aid or recommendation of any clerk because it was a Hankscraft, knowing defendant to be a manufacturer of a number of products for children and relying upon defendant's prior representations contained in the booklet accompanying the first vaporizer that its vaporizers were "safe" and "practically foolproof," as well as advertisements representing them

to be "tip-proof." This second vaporizer, purchased in a sealed carton, was known as Model 202A, and its general appearance as to size and shape and its method of operation were identical with the first unit. It was accompanied by an instruction booklet substantially identical to that furnished with the first vaporizer, which Mrs. McCormack again completely read.

This second vaporizer had been used about a half dozen times without incident when, on November 20, 1960, it was again set up for use in a small bedroom in the northwest corner of the house, occupied by Andrea, then 3 years and 9 months old, and her baby sister, Alison, 1 year and 10 months old. Andrea slept in a regular single bed and Alison in a crib. To the east of the doorway of this bedroom is an adjoining bathroom, which Andrea frequently used during the night. The doors of the bedrooms and bathroom were habitually left open and a light was usually burning in the bathroom. Andrea's bed was located in what might be described as the southwest corner of the room with the headboard against the doorway wall. The crib was in the northeast corner. A chifforobe stood next to the crib against the north wall. Andrea's mother set up the vaporizer at about 8 p. m. on a seat-step-type metal kitchen stool about 2½ feet high. She placed the stool in front of and against the chifforobe. The electric cord was extended behind the chifforobe and plugged into an outlet located there. The stool was about 4 feet from the foot of Andrea's bed. When steam started coming from the hole in the top of the unit, Mrs. McCormack left the room. After visiting a neighbor until about 11 p. m., she did some ironing, and at about 1:30 a. m., she returned to the room to replenish the water supply in the vaporizer. Using some type of "mitt," she lifted the cap and poured water from a milk bottle into the jar. She then went to bed.

At about 2:30 a. m., Mrs. McCormack heard a terrible scream and got out of bed. She found Andrea lying on the floor of her bedroom, screaming. The metal stool was upright, but the vaporizer was on the floor and the water had come out of the jar. The vaporizer had separated into its three component parts—a glass jar, a metal pan, and a plastic top-heating unit. The electric cord was still plugged into the electric outlet. In some manner, Andrea, while intending to go to the bath-

room, had tipped over the vaporizer and caused the water in the jar to spill upon her body.

Andrea was rushed to the hospital for treatment. More than 30 percent of her body had severe burns; she was suffering from shock; and her condition was critical for some time. She had third-degree burns on her chest, shoulders, and back. Skin-graft surgery was performed on her twice. She was hospitalized for 74½ days. Ten days later she was admitted to the Kenny Institute for treatment. She remained there 102 days and thereafter was taken to the Mayo Clinic, where she had further surgery in August 1961. At the time of the trial, Andrea had heavy scar tissue on her chest, stomach, legs, arms, and neck; a deformed jaw; restricted movement of her head; an irregular posture; and the prospect of 6 to 12 more surgical procedures during her lifetime. Her condition is largely permanent.

The "automatic-electric" vaporizer in question is of normal design and consists of three component parts—an aluminum pan which serves as a base, a 1-gallon glass jar or water reservoir which is inserted into the pan, and a black plastic cap to which is fastened a black plastic heating-chamber tube.

The glass jar, 6⅝ inches square and 8 inches high, is a so-called "standard gallon pickle jar" not specially manufactured as a component part. The top opening is 4½ inches in diameter and its outer neck has a male-type glass thread. To fill the jar to a designated fill mark requires .73 gallon of water.

The aluminum pan, which is made to fit the bottom of the jar, is 4 inches high. It has two plastic lifting and carrying handles. Four projections, ¾ inch in diameter and ⅛ inch in height, are regularly spaced on the bottom of the pan and serve as feet for the unit.

The plastic cap and heating chamber assembly has a domelike appearance in its upper portion, which is 5 inches in diameter and 2¾ inches high. Enclosed in a plastic tube which attaches to the upper portion are two narrow, 8-inch-long steel electrodes which extend from the underside of the cap and are fastened to terminals which connect to an electric plug-in type cord. This cord, about 6 feet long, is attached to the terminals through a hole in the cap. Opposite the electric cord is

a round steam hole ³⁄₁₆ inch in diameter. Directly below this there is moulded into the top a "medicament hollow." The heating chamber tube enclosing the electrodes is about 7⅝ inches long. It consists of a lower section 5⅛ inches long, which tapers upward from 1½ inches to 1⅞ inches in diameter, and an upper section 2½ inches long and 3 inches in diameter. The upper section has a flange 3¾ inches in diameter through which three screws are used to fasten both sections to the cap. A hole ⅛ inch in diameter is in the bottom of the lower section through which water in the jar reaches the electrodes. Eight holes ¼ inch in diameter are in the bottom of the upper section. They are intended to relieve any steam pressure that might build up inside the lower tube or the jar should the steam hole become obstructed and also to guard against "any chance of water spitting out the steam hole." The cap and heating chamber assembly, by its own weight, rests loosely upon the glass jar with the black tube extending down into the jar. There are no threads inside the plastic cap or any other means provided to fasten the cap to the threaded neck of the jar. This design and construction were intended by defendant to serve as a safety measure to avoid any buildup of steam in the glass jar, but it also has the result of allowing the water in the jar to gush out instantaneously when the vaporizer is tipped over. This unit can be tipped over easily by a child through the exertion of about 2 pounds of force.

To operate the vaporizer in accordance with the instructions contained in defendant's booklet, the "entire plastic cover" is removed, the glass jar is filled to the filling marker with tap water containing minerals, and the cord is plugged into an electric outlet, whereupon "[t]he vaporizer will produce a gentle cloud of steam within a few minutes." The heating unit is designed so that it automatically turns off whenever the water in the jar decreases to a certain level. As the booklet pictorially illustrates, the water from the jar enters the lower section of the heating chamber through the small hole at the bottom. Here it is heated until it boils and is vaporized into steam, which passes out of the unit through the hole in the cap.

Tests made of the unit established that after about 4 minutes of operation the water in the heating chamber reaches 212 degrees Fahrenheit

and steam emanates from the steam port. Although the water in the jar outside the heating chamber does not reach the boiling point, the upper portion of this water does reach 211 degrees within 35 minutes of operation and the middle portion reaches 211 degrees within 3 hours. The temperature of the outside of the jar ranges from 172 degrees after about 1 hour to 182 degrees after 5 hours. Thus, during most of the 6- to 8-hour period in which the unit is designed to operate without refilling, the water in the reservoir is scalding hot, since water of 145-degree temperature will burn and 180-degree water will cause third-degree burns on a child 5 years old.

By touch, a user can determine that the water in the jar outside the heating unit, as well as the jar and the plastic cap, becomes hot during the operation of the vaporizer. However, there is no movement of the water in the jar and no means by which a user could discern by sight or touch that this reserve water in the jar became and remained scalding hot. Plaintiff's parents, relying upon their understanding of what defendant represented in its instruction booklet, were reasonably led to believe up to the time of plaintiff's injury that, since steam was generated only in the heating unit, the temperature of the water in the jar during the entire operation of the vaporizer remained the same as when put in. At all of the times when replenishing the water in either the first or second vaporizer, plaintiff's mother followed the routine of removing the entire plastic cover by using some "glove" or "mitt" as a precaution against the steam. She would leave the cord plugged in, add water to the jar, replace the cover, wait until steam appeared, and then leave the unit unattended in the room. As her testimony implied, she at no time discovered by touching or handling the unit when it was in use that the temperature of any part of the water in the jar became hot.

The instruction booklet furnished by defendant did not disclose the scalding temperatures reached by the water in the jar, nor was any warning given as to the dangers that could result from an accidental upset of the unit. While plaintiff's mother realized that the unit could be tipped over by a sufficient external force, she justifiably relied upon defendant's representations that it was "safe," "practically foolproof," and "tip-proof." She understood this to mean that the unit "was safe to

use around [her] children" and that she "didn't have to worry" about dangers when it was left unattended in a child's room since this was the primary purpose for which it was sold.

In its booklet and advertising, defendant in fact made the representations relied upon by plaintiff's mother. In addition to the simple operating instructions and a pictorial "cut-away" indicating how the steam is generated by the electrodes in the heating chamber, the booklet stated:

"WHY THE HANKSCRAFT VAPORIZER IS SUPERIOR TO OTHERS IN DESIGN.

"Your vaporizer will run all night on one filling of water, directing a steady, gentle flow of medicated steam exactly where it is needed. No attention is necessary.

"It's safe, too, and practically foolproof. Since the water itself makes the electric contact, the vaporizer shuts off automatically when the water is gone. The electric unit cannot burn out."

The booklet also had a picture of a vaporizer sending steam over a baby's crib, alongside which was printed:

"For most effective use, the vaporizer should be placed at least four feet away from the person receiving treatment, and should not be placed above the patient's level."

Defendant's officers realized that the vaporizers would be primarily used in the treatment of children and usually would be unattended. They had knowledge that the water in the jar got scalding hot; that this water would cause third-degree burns on a small child; that the water in the jar would gush out instantaneously if the unit were tipped over; that the unit was not "tip-proof"; that the combination of the unsecured top and the hot water in the jar was dangerous because of the possibility that a child might tip it over during operation; and that, prior to plaintiff's injury, at least 10 to 12 children had been burned in this manner. Furthermore, defendant's officers realized that the fact the water in the jar got hot was not discernible during operation except by touching or handling the unit and that a user could conclude from their booklet that

steam was generated in the plastic core and be led to believe that the reserve water in the jar did not itself become scalding hot.

Plaintiff called two expert witnesses, whose qualifications in the field of product design were unquestioned. Both testified that the design of the vaporizer was defective principally in that it failed to provide a means for securing the plastic cover to the jar in a manner which would prevent the water in the jar from instantaneously discharging when the unit was tipped over. In the opinion of both, the unit could be tipped over with little force and this defective design created a risk of bodily harm to a child if the unit were left operating and unattended in the room. This defect could have been eradicated by the adoption of any one of several practical and inexpensive alternative designs which utilized simple and well-known techniques to secure the top to the jar. Any of these alternative designs could have been employed by defendant prior to its production of the second vaporizer by the application of sound product-design principles current at that time. Among these alternative designs was that of making threads on the inside of the plastic top so it could screw onto the jar and the putting of two or three small holes in the top, which would take care of any danger that steam would build up inside the jar. Both witnesses stated that such a change in design was essential to make the unit safe for its intended use because the presence of near-boiling water in the jar was not discernible by sight or touch and no warning of the risk of harm was contained in defendant's instruction booklet.

Plaintiff contends that the evidence not only raised jury issues as to negligence, breach of warranties, and causation but also is more than sufficient to support the jury's finding of liability on the two theories submitted. Defendant contends the evidence presented was so deficient to establish its liability on any ground that it is entitled to a judgment on the merits as a matter of law.

At this late date in the development of the law relating to the tort liability of manufacturers of all types of products for injuries caused by their products, there can be no doubt that a manufacturer is subject to liability for a failure to use reasonable care in the design of its product to any user or consumer, including any person who may reason-

ably be expected to be in the vicinity of its use, to protect against unreasonable risk of physical harm while the product is used for its intended purpose. Such liability may equally be predicated upon a failure to use reasonable care in giving adequate and accurate instructions as to the use of the product and a warning as to any dangers reasonably foreseeable in its intended use. Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688.

Plaintiff urges that defendant was negligent both in its failure to give any warning of the dangers inherent in the use of the vaporizer and in its adoption of an unsafe design. Plaintiff claims among other things that defendant, in undertaking to instruct as to the use of its vaporizer, violated its duty to use due care when it failed to inform that the water in the jar got scalding hot with temperatures up to 211 degrees Fahrenheit and to warn of the dangers of serious injury if the unit were upset during operation. Defendant concedes it gave no such warning but vigorously argues that a warning was not necessary since the fact that the water in the jar becomes and remains hot should be obvious to any user.

In support of its position, defendant claims that anyone touching the jar or plastic top after the vaporizer had been working for some time would realize they are hot and conclude the water in the jar is also hot, and that because the instructions indicate that steam is produced in the plastic heating chamber, a reader would necessarily conclude the water in the jar is hot since the heating unit obviously comes into direct contact with such water. Plaintiff, on the other hand, contends that a warning is necessary because the average user would not realize that this water becomes hot, much less that it becomes scalding hot. Plaintiff relies upon the undisputed evidence that there is no boiling activity of the reserve water in the jar and that there is no way short of actual temperature measurements to discern by sight or touch that this water reaches the dangerous temperature of 211 degrees. Further, plaintiff relies upon the evidence that the instructions furnished by defendant served to allay any suspicions a user might otherwise have as to the near-boiling temperature of the water or any apprehension of danger by indicating that the vaporizer was safe to use unattended in a child's

room throughout the night. Moreover, both of plaintiff's parents testified that neither had in fact become aware of the temperature of the water nor realized the danger that, if the unit were upset while in use, the water could scald and inflict third-degree burns on a child.

We have little difficulty in reaching the conclusion that the evidence justified the jury in finding that defendant failed to exercise reasonable care to inform users, including plaintiff's parents, of the scalding temperatures of the water and to warn of the dangers reasonably foreseeable in the use of the vaporizer. Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804. Surely the evidence does not as a matter of law compel a conclusion that the true nature and gravity of the dangers which could result from the scalding water in the jar were sufficiently obvious to most potential users as to preclude the jury from finding that due care required an appropriate warning. Under the court's instruction, the jury could, and quite likely did, conclude that defendant knew or should have reasonably foreseen that the primary use of its vaporizer involved the danger that a child might be severely burned by the rapid discharge of near-boiling water upon an intentional or accidental upset, and that a substantial number of users would not become aware of the scalding temperature of the water nor realize the potential dangers of using the vaporizer unattended in a child's room unless adequate information and an appropriate warning were given so that parents would take extraordinary precautions. These findings, together with defendant's utter failure to warn, and the finding that the dangers inherent in the vaporizer's use were not obvious and were outside the realm of common knowledge of potential users (especially in view of defendant's representations of safety) [1] are, we hold, supported by the evidence and alone justified the jury's verdict of liability.

We similarly conclude and hold that the evidence is also sufficient to support the jury's verdict of liability on the ground that defendant was negligent in adopting an unsafe design. It is well established that a manufacturer, despite lack of privity of contract, has a duty to use reasonable care in designing its product so that those it should expect will use it are

---

[1] Restatement, Torts (2d) § 388, comment b.

protected from unreasonable risk of harm while the product is being used for its intended use. A breach of such duty renders the manufacturer liable. Rosin v. International Harvester Co. 262 Minn. 445, 115 N. W. (2d) 50.[2] Clearly, such a duty was owed to plaintiff for defendant admitted that the primary, intended use of the vaporizer was for the treatment of children's colds and croup.

The proof is sufficient to support plaintiff's claim of defective design in that, among other defects,[3] defendant failed to exercise reasonable care in securing the plastic cover to the jar to guard against the reasonably foreseeable danger that a child would tip the unit over when it was in use and be seriously burned by coming in contact with the scalding water that would instantaneously gush out of the jar.

This proof of a specific defect which, under the circumstances, the jury could find caused the plaintiff's injuries distinguishes this case from the factual situations present in Jessen v. Schuneman's, Inc. 246 Minn.

---

[2] See, also, Johnson v. West Fargo Mfg. Co. 255 Minn. 19, 95 N. W. (2d) 497; Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688; Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804; Restatement, Torts (2d) § 398.

[3] Plaintiff claimed there were two other defects in design, but we believe the evidence insufficient to predicate liability upon either. It was argued that the water in the jar was rendered too hot because the design permitted steam and its condensate to escape from the eight ¼-inch holes in the upper section of the heating chamber into the water reservoir. But, plaintiff's experts failed to testify that if suggested changes had been adopted the water's temperature would have been reduced sufficiently so that it would not have caused third-degree burns to plaintiff. Plaintiff also argued that the vaporizer could be tipped too easily. While it was established that an alternative design would substantially increase the amount of force necessary to tip it over, the experts failed to testify as to how much force plaintiff likely would have exerted when she tipped the vaporizer over and therefore there was no indication whether the suggested changes would have prevented her from doing so. The matters which were omitted are not subjects of common knowledge, and in the absence of expert testimony, the jury could only speculate as to whether these suggested changes in design could have prevented plaintiff's injury. This constituted a failure of proof as to proximate cause. See, e. g., Miller v. Raaen, 273 Minn. 109, 139 N. W. (2d) 877; Ericksen v. Wilson, 266 Minn. 401, 123 N. W. (2d) 687.

13, 73 N. W. (2d) 786, and Wallace v. Knapp-Monarch Corp. (8 Cir.) 234 F. (2d) 853, relied upon by defendant.

To urge that a vaporizer is not a dangerous instrumentality is not persuasive to a reviewing court when the evidence reasonably permits a finding that a simple, practical, inexpensive, alternative design which fastened the top to the jar would have substantially reduced or eliminated the danger which caused plaintiff's injuries.[4] Defendant's experts testified that the design adopted was to guard against an explosion because of a buildup of steam in the heating unit and jar, but the jury could have accepted the testimony of plaintiff's experts which indicated the use of defendant's design was not necessary to accomplish this purpose. Moreover, the fact that at the time the second vaporizer was purchased many other brands of vaporizers on the market were designed in basically this same manner, while certainly relevant, did not necessarily bar the jury from concluding that the exercise of due care required the adoption of a different design.[5]

We also find no merit in defendant's contention that it was not negligent because any defect caused by its failure to secure the heating unit to the jar was obvious. Clearly the jury could have justifiably found that users, particularly children such as plaintiff who was a mere child of 3 years of age, are incapable of meaningfully comprehending the true nature and gravity of the risk to them that results from a product's design and of effectively acting so as to avoid the danger.[6] The jury could have concluded that protection of this class of persons required that defendant in the exercise of due care should have adopted one of the safe alternative designs. While the evidence with respect to this issue required a resolution of the conflicts in the testimony of expert witnesses, the jury

---

[4] Evidence of the existence of a feasible alternative design eliminating the unattached top renders the holding in Blissenbach v. Yanko, 90 Ohio App. 557, 107 N. E. (2d) 409, inapplicable to this case.

[5] See, 65A C. J. S., Negligence, § 232. Cf. Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804.

[6] See, 2 Harper & James, Torts, § 28.5. Cf. Schipper v. Levitt & Sons, Inc. 44 N. J. 70, 207 A. (2d) 314; Wright v. Massey-Harris, Inc. 68 Ill. App. (2d) 70, 215 N. E. (2d) 465.

was free to adopt the opinions of plaintiff's witnesses and to reach a verdict of liability on this ground of negligence also.

We also conclude that the evidence was sufficient to support a finding of liability upon a breach of an express warranty.

We are persuaded that whether the previously quoted language of the booklet, particularly in combination with the picture of a vaporizer sending steam over a baby's crib, amounted to an express warranty that it was "safe" for a user to let this vaporizer run all night in a child's room without attention was a jury question. No particular words are required to constitute an express warranty, and the representations made must be interpreted as an ordinary person would understand their meaning, with any doubts resolved in favor of the user.[7] Since parents instinctively exercise great care to protect their children from harm, the jury could justifiably conclude that defendant's representations were factual (naturally tending to induce a buyer to purchase) and not mere "puffing" or "sales talk."[8]

The finding, in compliance with the court's instruction, that "plaintiff's parents justifiably relied" on the representations is also supported by the evidence. Neither parent became aware of the high temperature of the water in the jar nor apprehended any danger from using the vaporizer in the prescribed manner. Plaintiff's mother specifically testified that she relied on defendant's representations. The jury properly may have viewed this testimony as inherently probable and true and concluded that plaintiff's mother placed substantial reliance upon defendant's express warranty in purchasing the second vaporizer.[9] That she did not rely solely

---

[7] See, McCormack Harvesting Mach. Co. v. Fields, 90 Minn. 161, 95 N. W. 886.

[8] Minn. St. 1961, § 512.12; Corporation of Presiding Bishop v. Cavanaugh, 217 Cal. App. (2d) 492, 32 Cal. Rptr. 144.

[9] See, Schilling v. Roux Distributing Co. Inc. 240 Minn. 71, 59 N. W. (2d) 907; Hansen v. Firestone Tire & Rubber Co. (6 Cir.) 276 F. (2d) 254; Marko v. Sears, Roebuck & Co. 24 N. J. Super. 295, 94 A. (2d) 348; Silverstein v. R. H. Macy & Co. 266 App. Div. 5, 40 N. Y. S. (2d) 916; Rogers v. Toni Home Permanent Co. 167 Ohio St. 244, 147 N. E. (2d) 612, 75 A. L. R. (2d) 103.

upon the warranty but also was motivated by her own favorable past experience with the first vaporizer is not determinative.[10] Nor does the fact that the representations in the booklet which accompanied the first vaporizer were not made simultaneously with the purchase of the second prevent the conclusion reached by the jury.[11]

As previously indicated, there was adequate support for the finding that defendant breached its warranty, since the facts which the jury could find established that the vaporizer was not "safe" for its primary intended use.

Defendant argues that plaintiff is barred from recovery for breach of express warranty because of failure to give notice of such breach within a "reasonable time" as required by Minn. St. 1961, § 512.49, of the sales act. We cannot agree. This argument, not unlike defendant's suggestion that the absence of privity of contract between defendant and plaintiff should likewise bar recovery, does not appeal to our sense of justice. It can be disposed of by adopting the rule of some jurisdictions that in personal injury actions alleging breach of warranty no such notice need be given because, as here, plaintiff is not a "buyer" within the contemplation of the statute.[12] But such disposition, and similarly the elimination of privity,[13] is only a transparent device to reach a desired result by eliminating bars to recovery imposed by the law of sales. Since the recent and often-cited cases of Henningsen v. Bloomfield Motors, Inc. 32 N. J. 358, 161 A. (2d) 69, 75 A. L. R. (2d) 1, and Greenman v. Yuba Power Products, Inc. 59 Cal. (2d) 57, 27 Cal. Rptr. 697, 377 P. (2d) 897, a host of decisions by many courts have adopted the view,

---

[10] Marshall v. Gilman, 52 Minn. 88, 53 N. W. 811.

[11] See, Vitro Corp. of America v. Texas Vitrified Supply Co. 71 N. Mex. 95, 376 P. (2d) 41.

[12] See, LaHue v. Coca-Cola Bottling, Inc. 50 Wash. (2d) 645, 314 P. (2d) 421; Piercefield v. Remington Arms Co. 375 Mich. 85, 133 N. W. (2d) 129; Wights v. Staff Jennings, Inc. 241 Ore. 301, 405 P. (2d) 624, which hold, without adopting the rule of strict tort liability discussed in the opinion, that the notice requirement is not applicable to nonpurchasers.

[13] This requirement has been expressly abolished by § 2-318 of the Uniform Commercial Code as to any person "in the family or household of his buyer," enacted after this action arose. Minn. St. 336.2—318.

first urged by Dean Prosser [14] and now embodied in Restatement, Torts (2d) § 402 A,[15] that the liability of a seller to persons injured by its defective product is not one governed by the law of contract warranties but by the law of strict liability in tort. This rule of strict tort liability, as it is appropriately called, qualifies as a tested legal theory along with the traditional theories of negligence and breach of warranty where the latter meet the purpose for which liability should be imposed upon a supplier of a product. However, in our view, enlarging a manufacturer's liability to those injured by its products more adequately meets public-policy demands to protect consumers from the inevitable risks of bodily harm created by mass production and complex marketing conditions. In a case such as this, subjecting a manufacturer to liability without proof of negligence or privity of contract, as the rule intends, imposes the cost of injury resulting from a defective product upon the maker, who can both most effectively reduce or eliminate the hazard to life and health, and absorb and pass on such costs, instead of upon the consumer, who possesses neither the skill nor the means necessary to protect himself adequately from either the risk of injury or its disastrous consequences.

If traditional commercial contractual limitations, such as the requirement of notice or the doctrine of privity, were applied to this case, defendant's liability upon the ground of breach of an express warranty could not be upheld. Plaintiff would be denied recovery despite adequate

---

[14] Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L. J. 1099, and Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791, where the cases are comprehensively and critically analyzed.

[15] Restatement, Torts (2d) § 402 A, provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

proof that the vaporizer was "in a defective condition unreasonably dangerous to the user"; that plaintiff was injured thereby; and that defendant represented the vaporizer as "safe" and did everything by advertising and otherwise to induce that belief while creating the risk and reaping the profit from its sales. Recovery would be denied unless, as here, the injured plaintiff is able to investigate fully, hire experts, and marshal evidence sufficiently persuasive to convince a jury that evidence of elaborate precautions employed by the manufacturer to make its product safe did not measure up to the standard of reasonable care.

Without attempting to discuss the many cases adopting the rule of strict liability and the many articles testifying to the remarkable shift toward its adoption,[16] we hold that neither notice nor privity need be alleged or proved in cases like the one before us. We do so not simply to eliminate these contractual limitations upon a claim for personal injury against a manufacturer based upon a breach of an express warranty (as

---

[16] Brown v. General Motors Corp. (4 Cir.) 355 F. (2d) 814 (Ohio law); Putnam v. Erie City Mfg. Co. (5 Cir.) 338 F. (2d) 911 (Texas law); Greeno v. Clark Equipment Co. (N. D. Ind.) 237 F. Supp. 427 (Indiana law); Greenman v. Yuba Power Products, Inc. 59 Cal. (2d) 57, 27 Cal. Rptr. 697, 377 P. (2d) 897, 13 A. L. R. (3d) 1049; Garthwait v. Burgio, 153 Conn. 284, 216 A. (2d) 189; Suvada v. White Motor Co. 32 Ill. (2d) 612, 210 N. E. (2d) 182; Dealers Transport Co. v. Battery Distributing Co. (Ky. App.) 402 S. W. (2d) 441; Meche v. Farmers Drier & Storage Co. (La. App.) 193 So. (2d) 807; State Stove Mfg. Co. v. Hodges (Miss.) 189 So. (2d) 113; Shoshone Coca-Cola Bottling Co. v. Dolinski, 82 Nev. 439, 420 P. (2d) 855; Williams v. Ford Motor Co. (Mo. App.) 411 S. W. (2d) 443; Santor v. A. & M. Karagheusian, Inc. 44 N. J. 52, 207 A. (2d) 305; Goldberg v. Kollsman Instrument Corp. 12 N. Y. (2d) 432, 240 N. Y. S. (2d) 592, 191 N. E. (2d) 81; Lonzrick v. Republic Steel Corp. 1 Ohio App. (2d) 374, 205 N. E. (2d) 92; Webb v. Zern, 422 Pa. 424, 220 A. (2d) 853; Ford Motor Co. v. Lonon, 217 Tenn. 400, 398 S. W. (2d) 240; Lascher, *Strict Liability in Tort for Defective Products: The Road To and Past Vandermark*, 38 So. Calif. L. Rev. 30; Keeton, *Products Liability— Liability Without Fault and the Requirement of a Defect*, 41 Tex. L. Rev. 855; Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn. L. Rev. 363; Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L. J. 5; Note, 55 Georgetown L. J. 286; 2 Frumer & Friedman, Products Liability, pp. 3–173 to 3–226.

was done long ago with respect to implied warranties) [17] but, more importantly, to declare our agreement with the principles underlying the rule of strict tort liability and to record our intention of applying that rule in this type of case. That this view is consistent with sound public-policy considerations is indicated by our previous decisions disclosing the active role of this court in the development of the rules respecting a manufacturer's liability. Thus, in Schubert v. J. R. Clark Co. 49 Minn. 331, 51 N. W. 1103, 15 L. R. A. 818, we substantially abolished privity in negligence actions by a consumer against the manufacturer. In Beck v. Spindler, 256 Minn. 543, 99 N. W. (2d) 670, we eliminated this requirement in actions by a purchaser against a manufacturer based upon implied warranties and expressly questioned whether the concept of privity ought not to be completely abrogated in product liability actions resulting in personal injuries.

We are fully mindful that plaintiff did not directly plead the theory of strict tort liability, request the court to instruct on it, nor urge this theory until this appeal. However, we perceive no prejudice to defendant, as its liability is adequately established on the ground of negligence. We have discussed a manufacturer's liability sounding in warranty to answer defendant's arguments and to disclose forthrightly the basic reasons for eliminating the defenses urged. Moreover, we desire to set at rest such future arguments which seek to raise various illusory contract defenses to a rule of liability which we believe should be imposed by law, in tort, as a matter of policy in cases such as this.

We also hold the evidence adequate to support a reasonable inference that defendant's negligence and breach of warranty proximately caused plaintiff's injury. From the fact that plaintiff sustained third-degree burns by coming in contact with near-boiling water, the obvious and reasonable inference is that her injuries were directly caused by the undisclosed presence and rapid discharge of the scalding water in the vaporizer jar.[18]

---

[17] Beck v. Spindler, 256 Minn. 543, 99 N. W. (2d) 670.

[18] Standafer v. First Nat. Bank, 243 Minn. 442, 68 N. W. (2d) 362; Paine v. Gamble Stores, Inc. 202 Minn. 462, 279 N. W. 257, 116 A. L. R. 407; Lindroth v. Walgreen Co. 329 Ill. App. 105, 67 N. E. (2d) 595, affirmed, 407 Ill. 121, 94 N. E. (2d) 847.

At best, under the court's instructions, defendant was permitted to argue that the negligence of plaintiff's mother was a superseding cause, for it is clear that the failure of plaintiff's parents to discover the defect or any other negligent conduct on the part of plaintiff's mother under any theory of liability cannot be imputed to plaintiff.[19] The jury found against defendant on this issue, and we doubt that a contrary finding could be sustained. We discover no evidentiary basis for a claim that the vaporizer was abnormally used or, indeed, was so placed in plaintiff's room that the propensity of children to tip things over when going to the bathroom at night was deliberately or negligently ignored, amounting to unforeseeable negligent conduct or assumption of risk by plaintiff's mother. Foreseeable intervention by a third party is not a superseding cause.[20]

Finally, we come to the troublesome question of reviewability of the order conditionally granting a new trial. Plaintiff urges that we review and reverse, and defendant insists that, since judicial discretion was exercised in granting the order, Minn. St. 605.09(e); Satter v. Turner, 257 Minn. 145, 100 N. W. (2d) 660; and Gothe v. Murray, 260 Minn. 181, 109 N. W. (2d) 350, require a dismissal of this portion of plaintiff's attempted appeal.

It is at once evident that if we agree with defendant we are placed in the untenable position of having held the evidence adequate to sustain the verdict while at the same time permitting a new trial on all issues to occur because the trial court in the exercise of discretion, as urged by defendant, presumably found the verdict not justified by the evidence. Complicating the matter is defendant's omission to assert before this court any claim that the order could be sustained on the ground that it was based exclusively upon errors of law prejudicial to defendant or that the damages awarded were excessive for reasons requiring a retrial on all issues; that the court did not specify the grounds for the order either in the order or an explanatory memorandum; and that Rule 59.01(8),

---

[19] Peterson v. Richfield Plaza, Inc. 252 Minn. 215, 89 N. W. (2d) 712.

[20] Knutson v. Nielsen, 256 Minn. 506, 99 N. W. (2d) 215. See, also, Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791, 826, for his treatment of intervening conduct to relieve a supplier of strict liability in tort.

Rules of Civil Procedure,[21] provides that, if it was based on insufficient evidence, "it shall not be presumed" on appeal to have been made on that ground unless "it be so expressly stated in the order."

It is true that the cases relied upon by defendant hold that a court's order conditionally granting a new trial entered pursuant to a blended motion is not reviewable of right upon an appeal from an order granting judgment n. o. v. if it is based upon any ground enumerated in Rule 59.01 requiring the exercise of discretion and there is even the slightest doubt that judicial discretion was exercised. However, here the basis for the order is not disclosed and cannot be ascertained. The recent case of Ginsberg v. Williams, 270 Minn. 474, 135 N. W. (2d) 213, would permit us to hold that the order is beyond the power of the court and therefore void. In that event, the procedural status of the motion is that upon the remittitur the trial court would be required to reconsider and rule on the motion for a new trial.[22] Were a new trial ordered upon grounds other than "errors of law occurring at the trial," Minn. St. 605.09(e) would deny plaintiff an appeal of right.[23] By strict adherence to this statutory limitation, it is conceivable that plaintiff would be denied an appeal even

---

[21] Rule 59.01, Rules of Civil Procedure, provides: "A new trial may be granted * * * for any of the following causes:

       \*   \*   \*   \*   \*

"(8) The verdict, decision, or report is not justified by the evidence, or is contrary to law; but, unless it be so expressly stated in the order granting a new trial, it shall not be presumed, on appeal, to have been made on the ground that the verdict, decision, or report was not justified by the evidence."

[22] Waldo v. St. Paul City Ry. Co. 244 Minn. 416, 70 N. W. (2d) 289.

[23] Minn. St. 605.09 provides: "An appeal may be taken to the supreme court:

       \*   \*   \*   \*   \*

"(e) From an order refusing a new trial, or from an order granting a new trial if the court expressly states therein, or in a memorandum attached thereto, that the order is based exclusively upon errors of law occurring at the trial, and upon no other ground; and the court shall specify such errors in its order or memorandum, but upon appeal, such order granting a new trial may be sustained for errors of law prejudicial to respondent other than those specified by the trial court."

though, despite our contrary holding, the court were to base its order upon the ground that the verdict was not justified by the evidence. A mere recital of this procedural dilemma demonstrates its absurd conflict with the responsibilities vested in a reviewing court.

We believe the situation presented compels us to exercise our discretionary authority provided by the Constitution, if not, indeed, intended by § 605.05, subd. 2, of the new Civil Appeal Code.[24] This amendment, enacted subsequent to the cases relied upon, surely intends that once a case has been properly brought before us on appeal we may, in our discretion, "review any other matter as the interests of justice may require." In exercising this discretionary power, we are for all practical purposes overruling our decisions in Satter v. Turner, *supra,* and Gothe v. Murray, *supra,* wherein we held we could not review conditional orders granting a new trial despite our review of the orders granting judgment n. o. v. Even though there are statutory limitations on a litigant's right to a review of an order granting a new trial, the order granting judgment n. o. v. is clearly reviewable of right on an appeal from judgment, and both the amendment to the code and commonsense dictate that we should review the whole order. We hold therefore that where, as here, a conditional order granting a new trial is based in whole or in part upon the insufficiency of the evidence and such issue is also raised and determined on review of the order granting judgment n. o. v., we will, if we deem the interests of justice require, review the order in its entirety. Perhaps future cases may require broadening this exercise of discretionary review, but this holding is sufficient for this case.[25]

---

[24] Section 605.05, subd. 2, provides: "On appeal from an order the supreme court may review any order affecting the order from which the appeal is taken and on appeal from a judgment may review any order involving the merits or affecting the judgment. It may review any other matter as the interests of justice may require."

[25] See Ginsberg v. Williams, 270 Minn. 474, 476, note 3, 135 N. W. (2d) 213, 216, note 3, citing cases which "emphasize[d] the view that appeals pursuant to statute are rights granted to litigants by the legislature, not limitations on the 'appellate jurisdiction of this court [which] is not derived from the legislature, but from the constitution (article 6, § 2).'" See, also, proposed amendment to Rule 50.02(4, 5, 6), Rules of Civil

In reversing the order, we are unable to find a ground upon which it can be upheld. As we have stated, the evidence justified the verdict of liability and also, we believe, the award of damages. We find no errors of law occurring at trial which were prejudicial to defendant. Defendant did not specifically assign any such errors in its motion in the trial court or assert any by brief or argument before this court. Nor is it claimed on this appeal that the damages are excessive. We appreciate that defendant may have refrained from arguing prejudicial error or excessive damages because of its position that the order for a new trial was not reviewable, but we have scrutinized the record with great care, resolving any doubts most favorably to defendant, and we are unable to find any procedural, evidentiary, or other errors which adversely affected defendant's substantial rights and upon which the conditional order granting a new trial could be sustained.

Reversed with directions to enter judgment upon the verdict.

Procedure, and Rule 103.04, subd. 2, of the proposed Rules of Civil Appellate Procedure.